Mr. Justice Clark
delivered the opinion of the Court.
In Mapp v. Ohio, 367 U. S. 643 (1961), we held that the exclusion of evidence seized in violation of the search and seizure provisions of the Fourth Amendment was required of the States by the Due Process Clause of the Fourteenth Amendment. In so doing we overruled Wolf v. Colorado, 338 U. S. 25 (1949), to the extent that it failed to apply the exclusionary rule to the States.[1] This case presents the question of whether this requirement operates retrospectively upon cases finally decided in the *634 period prior to Mapp. The Court of Appeals for the Fifth Circuit held that it did not, 323 F. 2d 11, and we granted certiorari in order to settle what has become a most troublesome question in the administration of justice.[2] 377 U. S. 930. We agree with the Court of Appeals.
*635 The petitioner was convicted in a Louisiana District Court on May 28, 1959, of “simple burglary.” At the time of his arrest he had been under surveillance for two days as a suspect in connection with another burglary. He was taken to the police station, searched, and keys were taken from his person. After he was booked and placed in jail, other officers took his keys, entered and searched his home, and seized certain property and papers. Later his place of business was entered and searched and seizures were effected. These intrusions were made without a warrant. The State District Court held that the arresting officers had reasonable cause for the arrest under Louisiana law and finding probable cause to search as an incident to arrest it held the seizures valid. The Supreme Court of Louisiana affirmed in February 1960.
On June 19,1961, Mapp was announced. Immediately thereafter petitioner filed an application'for habeas corpus in the state court on the basis of Mapp. The writ being denied in the Louisiana courts, he then filed a like application in the United States District Court. After denial there he appealed and the Court of Appeals affirmed. It found the searches too remote from the arrest and therefore illegal but held that the constitutional requirement of exclusion of the evidence under Mapp was not retrospective. Petitioner has two points: (1) that the Court of Appeals erred in holding that Mapp was not retrospective; and (2) that even though Mapp be held not to operate retrospectively, the search in his case was subsequent to that in Mapp, and while his final conviction was long prior to our disposition of it, his case should nevertheless be governed by Mapp.
Initially we must consider the term “retrospective” for the purposes of our opinion. A ruling which is purely prospective does not apply even to the parties before the *636 court.[3] See, e. g., England v. Louisiana State Board of Medical Examiners, 375 U. S. 411 (1964). See also Great Northern R. Co. v. Sunburst Oil & Refining Co., 287 U. S. 358 (1932). However, we are not here concerned with pure prospectivity since we applied the rule announced in Map-p to reverse Miss Mapp’s conviction. That decision has also been applied to cases still pending on direct review at the time it was rendered.[4] Therefore, in this case, we are concerned only with whether the exclusionary principle enunciated in Mapp applies to state court convictions which had become final[5] before rendition of our opinion.
I.
While to some it may seem “academic” it might be helpful to others for us to briefly outline the history and theory of the problem presented.
At common law there was no authority for the proposition that judicial decisions made law only for the future.[6] Blackstone stated the rule that the duty of the court was not to “pronounce a new law, but to maintain and expound *637 the old one.” 1 Blackstone, Commentaries 69 (15th ed. 1809) .[7] This Court followed that rule in Norton v. Shelby County, 118 U. S. 425 (1886),[8] holding that unconstitutional action “confers no rights; it imposes no duties; it affords no protection; it creates no office; it is, in legal contemplation, as inoperative as though it had never been passed.” At 442. The judge rather than being the creator of the law was but its discoverer. Gray, Nature and Sources of the Law 222 (1st ed. 1909). In the case of the overruled decision, Wolf v. Colorado, supra, here, it was thought to be only a failure at true discovery and was consequently never the law; while the overruling one, Mapp, was not “new law but an application of what is, and theretofore had been, the true law.” Shulman, Retroactive Legislation, 13 Encyclopaedia of the Social Sciences 355, 356 (1934).
On the other hand, Austin maintained that judges do in fact do something more than discover law; they make *638 it interstitially by filling in with judicial interpretation the vague, indefinite, or generic statutory or common-law terms that alone are but the empty crevices of the law. Implicit in such an approach is the admission when a case is overruled that the earlier decision was wrongly decided. However, rather than being erased by the later overruling decision it is considered as an existing juridical fact until overruled, and intermediate cases finally decided under it are not to be disturbed.
The Blackstonian view ruled English jurisprudence and cast its shadow over our own as evidenced by Norton v. Shelby County, supra. However, some legal philosophers continued to insist that such a rule was out of tune with actuality largely because judicial repeal ofttime did “work hardship to those who [had] trusted to its existence.” Cardozo, Address to the N. Y. Bar Assn., 55 Rep. N. Y. State Bar Assn. 263, 296-297 (1932). The Austinian view gained some acceptance over a hundred years ago when it was decided that although legislative divorces were illegal and void, those previously granted were immunized by a prospective application of the rule of the case. Bingham v. Miller, 17 Ohio 445 (1848). And as early as 1863 this Court drew on the same concept in Gelpcke v. Dubuque, 1 Wall. 175 (1863). The Supreme Court of Iowa had repeatedly held that the Iowa Legislature had the power to authorize municipalities to issue bonds to aid in the construction of railroads. After the City of Dubuque had issued such bonds, the Iowa Supreme Court reversed itself and held that the legislature lacked such power. In Gelpcke, which arose after the overruling decision, this Court held that the bonds issued under the apparent authority granted by the legislature were collectible. “However we may regard the late [overruling] case in Iowa as affecting the future, it can have no effect upon the past.” At 206. The theory was, as Mr. Justice Holmes stated in Kuhn v. Fairmont Coal Co., 215 U. S. *639 349, 371 (1910), “that a change of judicial decision after a contract has been made on the faith of an earlier one the other way is a change of the law.” And in 1932 Mr. Justice Cardozo in Great Northern R. Co. v. Sunburst Oil & Refining Co., 287 U. S. 358, applied the Austinian approach in denying a federal constitutional due process attack on the prospective application of a decision of the Montana Supreme Court. He said that a State “may make a choice for itself between the principle of forward operation and that of relation backward.” At 364. Mr. Justice Cardozo based the rule on the avoidance of “injustice or hardship” citing a long list of state and federal cases supporting the principle that the courts had the power to say that decisions though later overruled “are law none the less for intermediate transactions.” At 364. Eight years later Chief Justice Hughes in Chicot County Drainage Dist. v. Baxter State Bank, 308 U. S. 371 (1940), in discussing the problem made it clear that the broad statements of Norton, supra, “must be taken with qualifications.” He reasoned that the actual existence of the law prior to the determination of unconstitutionality “is an operative fact and may have consequences which cannot justly be ignored. The past cannot always be erased by a new judicial declaration.” He laid down the rule that the “effect of the subsequent ruling as to invalidity may have to be considered in various aspects.” At 374.
One form of limited retroaction which differs somewhat from the type discussed above is that which was established in United States v. Schooner Peggy, 1 Cranch 103 (1801). There, a schooner had been seized under an order of the President which commanded that any armed French vessel found on the high seas be captured. An order of condemnation was entered on September 23, 1800. However, while the case was pending before this Court the United States signed an agreement with France providing that any property captured and not “defini *640 tively condemned” should be restored. Chief Justice Marshall said:
“It is in the general true that the province of an appellate court is only to enquire whether a judgment when rendered was erroneous or not. But if subsequent to the judgment and before the decision of the appellate court, a law intervenes and positively changes the rule which governs, the law must be obeyed, or its obligation denied . . . [and] where individual rights . . . are sacrificed for national purposes . . . the court must decide according to existing laws, and if it be necessary to set aside a judgment . . . which cannot be affirmed but in violation of law, the judgment must be set aside.” At 110.
This same approach was subsequently applied in instances where a statutory change intervened, Carpenter v. Wabash R. Co., 309 U. S. 23 (1940); where a constitutional amendment was adopted, United States v. Chambers, 291 U. S. 217 (1934); [9] and where judicial decision altered or overruled earlier case law, Vandenbark v. Owens-Illinois Glass Co., 311 U. S. 538 (1941).[10]
*641 Under our cases it appears (1) that a change in law will be given effect while a case is on direct review, Schooner Peggy, supra,[11]' and (2) that the effect of the subsequent ruling of invalidity on prior final judgments when collaterally attacked is subject to no set “principle of absolute retroactive invalidity” but depends upon a consideration of “particular relations . . . and particular conduct ... of rights claimed to have become vested, of status, of prior determinations deemed to have finality” ; and “of public policy in the light of the nature both of the statute and of its previous application.” Chicot County Drainage Dist. v. Baxter State Bank, supra, at 374.
That no distinction was drawn between civil and criminal litigation is shown by the language used not only in Schooner Peggy, supra, and Chicot County, supra, but also in such cases as State v. Jones, 44 N. M. 623, 107 P. 2d 324 (1940) and James v. United States, 366 U. S. 213 (1961). In the latter case, this Court laid down a prospective principle in overruling Commissioner v. Wilcox, 327 U. S. 404 (1946), “in a manner that will not prejudice those who might have relied on it.” [12] At 221. *642 Thus, the accepted rule today is that in appropriate cases the Court may in the interest of justice make the rule prospective. And “there is much to be said in favor of such a rule for cases arising in the future.” Mosser v. Darrow, 341 U. S. 267, at 276 (dissenting opinion of Black, J.).
While the cases discussed above deal with the invalidity of statutes or the effect of a decision overturning long-established common-law rules, there seems to be no impediment — constitutional or philosophical — to the use of the same rule in the constitutional area where the exigencies of the situation require such an application. It is true that heretofore, without discussion, we have applied new constitutional rules to cases finalized before the promulgation of the rule.[13] Petitioner contends that our *643 method of resolving those prior cases demonstrates that an absolute rule of retroaction prevails in the area of constitutional adjudication. However, we believe that the Constitution neither prohibits nor requires retrospective effect. As Justice Cardozo said, “We think the federal constitution has no voice upon the subject.” [14]
Once the premise is accepted that we are neither required to apply, nor prohibited from applying, a decision retrospectively, we must then weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation. We believe that this approach is particularly correct with reference to the Fourth Amendment’s prohibitions as to unreasonable searches and seizures. Rather than “disparaging” the Amendment we but apply the wisdom of Justice Holmes that “[t]he life of the law has not been logic: it has been experience.” Holmes, The Common Law 5 (Howe ed. 1963).[15]
II.
Since Weeks v. United States, 232 U. S. 383 (1914), this Court has adhered to the rule that evidence seized by federal officers in violation of the Fourth Amend *644 ment is not admissible at trial in a federal court. In 1949 in Wolf v. Colorado, supra, the Court decided that while the right to privacy — “the core of the Fourth Amendment” — was such a basic right as to be implicit in “the concept of ordered liberty” and thus enforceable against the States through the Fourteenth Amendment, “the ways of enforcing such a basic right raise questions of a different order. How such arbitrary conduct should be checked, what remedies against it should be afforded, the means by which the right should be made effective, are all questions that are not to be so dogmatically answered as to preclude the varying solutions which spring from an allowable range of judgment on issues not susceptible of quantitative solution.” At 27-28.
The Court went on to say that the federal exclusionary rule was not “derived from the explicit requirements of the Fourth Amendment .... The decision was a matter of judicial implication.” At 28. Since “we find that in fact most of the English-speaking world does not regard as vital to such protection the exclusion of evidence thus obtained, we must hesitate to treat this remedy as an essential ingredient of the right.”[16] At 29. While granting that “in practice” the exclusion of evidence might be “an effective way of deterring unreasonable searches,” the Court concluded that it could not “condemn as falling below the minimal standards assured by the Due Process Clause a State’s reliance upon other methods which, if consistently enforced, would be equally effective.” At 31. The continuance of the federal exclusionary rule was excused on the ground that the reasons for it were more *645 “compelling” since public opinion in the community could be exerted against oppressive conduct by local police far more effectively than it could throughout the country.
The “asymmetry which Wolf imported into the law,” Mapp v. Ohio, supra, at 670 (concurring opinion of Douglas, J.), was indicated by a decision announced on the same day, Lustig v. United States, 338 U. S. 74 (1949), holding that evidence given to federal authorities “on a silver platter” by state officers was not excludable in federal trials. At 79. Wolfs holding, in conjunction with the “silver platter” doctrine of Lustig, provided wide avenues of abuse in the Weeks’ exclusionary rule in the federal courts. Evidence seized in violation of the Fourth Amendment by state officers was turned over to federal officers and admitted in evidence in prosecutions in the federal courts. In 1951 Wolf was strengthened by Stef-anelli v. Minard, 342 U. S. 117, in which the Court refused to permit a federal court to enjoin the use of evidence in a state criminal proceeding that had been illegally seized by state officers. In 1952, however, the Court could not tolerate the procedure involved in Rochin v. California, 342 U. S. 165, where morphine capsules pumped from the accused’s stomach by state officers were admitted in evidence in a state court. It struck down the conviction on due process grounds under the Fourteenth Amendment because the action was shocking to the conscience. In 1954 came Irvine v. California, 347 U. S. 128, in which the State admitted evidence procured via a microphone secreted clandestinely by state police in the accused’s bedroom. These “incredible” circumstances did not sufficiently shock the conscience of the Court into applying the Rochin test. Instead the case went off on the doctrine of Wolf. Mr. Justice Jackson in announcing the judgment of the Court overruled those who urged that Wolf “applies only to searches and seizures which produce on our minds *646 a mild shock, while if the shock is more serious, the states must exclude the evidence or we will reverse the conviction.” At 133-134. He strongly reaffirmed Wolf stating:
“Now that the Wolf doctrine is known to them, state courts may wish further to reconsider their eviden-tiary rules. But to upset state convictions even before the states have had adequate opportunity to adopt or reject the rule would be an unwarranted use of federal power.” At 134.
The opinion in dealing with the operation of the exclusionary rule said that it “must be remembered that petitioner is not invoking the Constitution to prevent or punish a violation of his federal right recognized in Wolf ... . He is invoking it only to set aside his own conviction of crime. . . . Rejection of the evidence does nothing to punish the wrong-doing official, while it may, and likely will, release the wrong-doing defendant. ... [It] does nothing to protect innocent persons who are the victims of illegal but fruitless searches.” At 136. Admitting the futility of other remedies available to the victims of illegal searches, Mr. Justice Jackson and the then Chief Justice suggested that the “Clerk of this Court should be directed to forward a copy of the record in this case, together with a copy of this opinion, for attention of the Attorney General of the United States” with a view to prosecution under the Civil Rights Act, 62 Stat. 696, 18 U. S. C. §242 (1958 ed.). In concurring in the judgment in Irvine the writer of this opinion indicated his displeasure with Wolf but observed that since the Court “still refuses today” to overrule it he felt bound by Wolf but had hopes that “strict adherence to the tenor of that decision may produce needed converts for its extinction.” At 138-139. The Court continued to broaden the rule of exclusion when, in 1956, it held that a federal agent might be enjoined from transferring to state authorities evidence that he *647 had seized on an illegal federal warrant, or testifying with regard to it in a state prosecution. Rea v. United States, 350 U. S. 214. In 1960 the Court’s dissatisfaction with the “silver platter” doctrine, Lustig v. United States, supra, led to its rejection in the leading case of Elkins v. United States, 364 U. S. 206. The factual situation being the converse of Rea v. United States, supra, the Court tightened the noose of exclusion in order to strangle completely the use in the federal courts of evidence illegally seized by state agents. It was in Elkins that the Court emphasized that the exclusionary rule was “calculated to prevent, not to repair. Its purpose is to deter — to compel respect for the constitutional guaranty in the only effectively available way — by removing the incentive to disregard it.” [17] At 217.
Mapp was announced in 1961. The Court in considering “the current validity of the factual grounds upon which Wolf was based” pointed out that prior to Wolf “almost two-thirds of the States were opposed to the use of the exclusionary rule, now, despite the Wolf case, more than half of those since passing upon it . . . have wholly or partly adopted or adhered to the Weeks rule.” At 651. We then cited California as typical of those adopting the rule since Wolf. It was “ 'compelled to reach that conclusion,’ ” we said, quoting California’s highest court, “ ‘because other remedies have completely failed to secure compliance with the constitutional provisions . . . .’ People v. Cahan, 44 Cal. 2d 434 . . . .” We went on to find that “[t]he experience of California that such other remedies have been worthless and futile is buttressed by the experience of other States. The obvious futility of relegating the Fourth Amendment to the protection of other remedies has, moreover, been recog *648 nized by this Court since Wolf. See Irvine v. California _” At 652-653. In discussing People v. Defore, 242 N. Y. 13, 150 N. E. 585, upon which Wolf heavily relied, we concluded that “Likewise, time has set its face against what Wolf called the ‘weighty testimony’ of People v. Defore . . . ‘that [t]he Federal rule as it stands is either too strict or too lax.’ 242 N. Y., at 22.” At 653. We concluded that “the force of that reasoning has been largely vitiated by later decisions of this Court,” at 653, which had closed all of the courtroom doors “open to evidence secured by official lawlessness . . .” save that of the state courts. At 655. That door was closed by Mapp.
In recapitulation, we found in Mapp that Wolf rested on these grounds. First, that the “contrariety of views of the States” as to the use of the exclusionary rule was “particularly impressive.” Second, “ ‘other means of protection’ [of Fourth Amendment rights] ha[d] been afforded” than the exclusionary rule. And, third, the “weighty testimony” of People v. Defore, supra. As to the first, we found the lineup of the States as to the exclusionary rule had shifted to where a majority favored it; as to the second, that the other means of protection had proven to be “worthless and futile” and had not reduced the incidence of police lawlessness during the 12 years since Wolf was announced but that Wolf had operated as a license for police illegality; and, as to the third, that our cases subsequent to Mapp had completely closed the laxity in the federal exclusionary rule complained of in People v. Defore, supra. We also affirmatively found that the exclusionary rule was “an essential part of both the Fourth and Fourteenth Amendments” and the only effective remedy for the protection of rights under the Fourth Amendment; that it would stop the needless “shopping around” that was causing conflict between federal and state courts, as was permitted in Wilson v. Schnettler, 365 U. S. 381 (1961); that it would withdraw the invitation *649 which Wolf extended to federal officers to step across the street to the state’s attorney with their illegal evidence, thus eliminating a practice which tended to destroy the entire system of constitutional restraints on which the liberties of the people rest; that it would promote state-federal cooperation in law enforcement by rejecting the double standard of admissibility of illegal evidence which tends to breed suspicion among the officers, encourages disobedience to the Constitution on the part of all the participants and violates “the imperative of judicial integrity.” Mapp v. Ohio, supra, at 657-660. In short, just as other cases had found the exclusionary rule to be a deterrent safeguard necessary to the enforcement of the Amendment, Silverthorne Lumber Co. v. United States, 251 U. S. 385 (1920), Mapp bottomed its rule on its necessity as a “sanction upon which [the Fourth Amendment’s] protection and enjoyment had always been deemed dependent under the Boyd, Weeks and Silver-thome cases.” At 655. Mapp’s rationale was that since Wolf we had on an ad hoc basis been led to exclude all evidence in both state and federal courts where a federal agent had participated in the illegal search. Only a few States had made any changes in their rule of admissibility since Wolf and many of those not following the federal exclusionary rule were, in effect, using Wolf as a license to violate the Fourth Amendment’s proscription of unreasonable searches and seizures as applied to the States by the Wolf case itself. As we noted in Mapp “further delay in [applying the exclusionary rule to the States] could have no effect other than to compound the difficulties”; a definitive continuance of Wolf might have increased the number of cases involving illegal searches in non-exclusionary States and also enticed those in the exclusionary column to reverse their position, as some States had done prior to Mapp.
*650 III.
We believe that the existence of the Wolf doctrine prior to Mapp is “an operative fact and may have consequences which cannot justly be ignored. The past cannot always be erased by a new judicial declaration.” Chicot County Drainage Dist. v. Baxter State Bank, supra, at 374. The thousands of cases that were finally decided on Wolf cannot be obliterated. The “particular conduct, private and official,” must be considered. Here “prior determinations deemed to have finality and acted upon accordingly” have “become vested.” And finally, “public policy in the light of the nature both of the . . . [Wolf doctrine] and of its previous application” must be given its proper weight. Ibid. In short, we must look to the purpose of the Mapp rule; the reliance placed upon the Wolf doctrine; and the effect on the administration of justice of a retrospective application of Mapp.
It is clear that the Wolf Court, once it had found the Fourth Amendment’s unreasonable Search and Seizure Clause applicable to the States through the Due Process Clause of the Fourteenth Amendment, turned its attention to whether the exclusionary rule was included within the command of the Fourth Amendment. This was decided in the negative. It is clear that based upon the factual considerations heretofore discussed the Wolf Court then concluded that it was not necessary to the enforcement of the Fourth Amendment for the exclusionary rule to be extended to the States as a requirement of due process. Mapp had as its prime purpose the enforcement of the Fourth Amendment through the inclusion of the exclusionary rule within its rights. This, it was found, was the only effective deterrent to lawless police action. Indeed, all of the cases since Wolf requiring the exclusion of illegal evidence have been based on the necessity for an effective deterrent to illegal police *651 action. See, e. g., Rea v. United States, supra. We cannot say that this purpose would be advanced by making the rule retrospective. The misconduct of the police prior to Mapp has already occurred and will not be corrected by releasing the prisoners involved. Nor would it add harmony to the delicate state-federal relationship of which we have spoken as part and parcel of the purpose of Mapp. Finally, the ruptured privacy of the victims’ homes and effects cannot be restored. Reparation comes too late.
It is true that both the accused and the States relied upon Wolf. Indeed, Wolf and Irvine each pointed the way for the victims of illegal searches to seek reparation for the violation of their privacy. Some pursued the same. See Monroe v. Pape, 365 U. S. 167 (1961). In addition, in Irvine, a flag in a concurring opinion warned that Wolf was in stormy weather. On the other hand, the States relied on Wolf and followed its command. Final judgments of conviction were entered prior to Mapp. Again and again this Court refused to reconsider Wolf and gave its implicit approval to hundreds of cases in their application of its rule. In rejecting the Wolf doctrine as to the exclusionary rule the purpose was to deter the lawless action of the police and to effectively enforce the Fourth Amendment. That purpose will not at this late date be served by the wholesale release of the guilty victims.
Finally, there are interests in the administration of justice and the integrity of the judicial process to consider. To make the rule of Mapp retrospective would tax the administration of justice to the utmost. Hearings would have to be held on the excludability of evidence long since destroyed, misplaced or deteriorated. If it is excluded, the witnesses available at the time of the original trial will not be available or if located their memory will be dimmed. To thus legitimate such an extraordinary *652 procedural weapon that has no bearing on guilt would seriously disrupt the administration of justice.
It is urged, however, that these same considerations apply in the cases that we have applied retrospectively in other areas,[18] notably that of coerced confessions, and that the Mapp exclusionary rule should, therefore, be given the same dignity and effect. Two cases are cited, Fay v. Noia, 372 U. S. 391 (1963), and Reck v. Pate, 367 U. S. 433 (1961), but neither is apposite. It is said that we ordered new trials 25 years after conviction in the latter and after the lapse of 21 years in the former. This time table is true but that is all. The principle that a coerced confession is not admissible in a trial predated the arrests as well as the original convictions in each of these cases. See Brown v. Mississippi, 297 U. S. 278 (1936). There was no question of retrospective operation involved in either case. Moreover, coerced confessions are excluded from evidence because of “a complex of values,” Blackburn v. Alabama, 361 U. S. 199 (1960), including “the likelihood that the confession is untrue”; “the preservation of the individual’s freedom of will”; and “‘[t]he abhorrence of society to the use of involuntary confessions.’ ” At 207. Cited with approval in Jackson v. Denno, 378 U. S. 368, 385-386 (1964). But there is no likelihood of unreliability or coercion present in a search- and-seizure case. Rather than being abhorrent at the time of seizure in this case, the use in state trials of illegally seized evidence had been specifically authorized by this Court in Wolf.[19] Furthermore, in Noia, the confession was admittedly coerced and the sole issue involved the availability of federal habeas corpus in a state convie *653 tion, where state post-conviction remedies had been exhausted but the accused had failed to appeal from his original conviction. Nothing of that kind is involved here and this holding has no bearing whatever on Noia or Reck, for that matter. Finally, in each of the three areas in which we have applied our rule retrospectively[20] the principle that we applied went to the fairness of the trial — the very integrity of the fact-finding process. Here, as we have pointed out, the fairness of the trial is not under attack. All that petitioner attacks is the admissibility of evidence, the reliability and relevancy of which is not questioned, and which may well have had no effect on the outcome.
Nor can we accept the contention of petitioner that the Mapp rule should date from the day of the seizure there, rather than that of the judgment of this Court. The date of the seizure in Mapp has no legal significance. It was the judgment of this Court that changed the rule and the date of that opinion is the crucial date. In the light of the cases of this Court this is the better cutoff time. See United States v. Schooner Peggy, supra.
All that we decide today is that though the error complained of might be fundamental it is not of the nature *654 requiring us to overturn all final convictions based upon it. After full consideration of all the factors we are not able to say that the Mapp rule requires retrospective application.

Affirmed.

 Although Mapp may not be considered to be an overruling decision in the sense that it did not disturb the earlier holding of Wolf that the search and seizure provisions of the Fourth Amendment are applicable to the States, its effect certainly was to change existing law with regard to enforcement of the right.

 A split of authority has developed in the various courts of appeals concerning the retrospectivity of Mapp. Compare Hall v. Warden, 313 F. 2d 483 (C. A. 4th Cir. 1963) (retroactive); Walker v. Peppersack, 316 F. 2d 119 (C. A. 4th Cir. 1963) (retroactive); California v. Hurst, 325 F. 2d 891 (C. A. 9th Cir. 1963) (retroactive), with Gaitan v. United States, 317 F. 2d 494 (C. A. 10th Cir. 1963) (prospective) ; Linkletter v. Walker, 323 F. 2d 11 (C. A. 5th Cir. 1963) (prospective) ; Sisk v. Lane, 331 F. 2d 235 (C. A. 7th Cir. 1964) (prospective) ; United States ex rel. Angelet v. Fay, 333 F. 2d 12 (C. A. 2d Cir. 1964) (prospective).
About the only point upon which there was agreement in the cases cited was that our opinion in Mapp did not foreclose the question.
The state courts which have considered the question have almost unanimously decided against application to cases finalized prior to Mapp. See, e. g., Beltowski v. Tahash, 266 Minn. 182, 123 N. W. 2d 207, cert. denied, 375 U. S. 947 (1963); Moore v. State, 274 Ala. 276, 147 So. 2d 835 (1962), cert. denied, 374 U. S. 811 (1963); People v. Muller, 11 N. Y. 2d 154, 182 N. E. 2d 99, cert. denied, 371 U. S. 850 (1962).
Commentators have also split over the question of absolute retro-activity. See Bender, The Retroactive Effect of an Overruling Constitutional Decision: Mapp v. Ohio, 110 U. Pa. L. Rev. 650 (1962); Freund, New Vistas in Constitutional Law, 112 U. Pa. L. Rev. 631 (1964); Traynor, Mapp v. Ohio at Large in the Fifty States, 1962 Duke L. ,T. 319; Weinstein, Local Responsibility for Improvement of Search and Seizure Practices, 34 Rocky Mt. L. Rev. 150 (1962); Note, Collateral Attack of Pre-Mapp v. Ohio Convictions Based on Illegally Obtained Evidence in State Courts, 16 Rutgers L. Rev. 587 (1962); Note, Prospective Overruling and Retroactive Application in the Federal Courts, 71 Yale L. J. 907 (1962). Contra, Currier, Time and Change in Judge-Made Law: Prospective Overruling, 51 Va. L. Rev. 201 (1965); Meador, Habeas Corpus and the “Retroactivity” Illusion, 50 Va. L. Rev. 1115 (1964); Torcía & King, The Mirage of Retroactivity and Changing Constitutional Concepts,. 66 Dick. L. Rev. 269 (1962).

 It has been suggested that this Court is prevented by Article III from adopting the technique of purely prospective overruling. Note, 71 Yale L. J. 907, 933 (1962). But see 1A Moore, Federal Practice 4082-4084 (2d ed. 1961); Currier, supra, n. 2, at 216-220. However, no doubt was expressed of our power under Article III in England v. Louisiana State Board of Medical Examiners, 375 U. S. 411 (1964). See also Griffin v. Illinois, 351 U. S. 12, 20 (1956) (concurring opinion of Frankfurter, J.).

 Ker v. California, 374 U. S. 23 (1963); Fahy v. Connecticut, 375 U. S. 85 (1963); Stoner v. California, 376 U. S. 483 (1964).

 By final we mean where the judgment of conviction was rendered, the availability of appeal exhausted, and the time for petition for certiorari had elapsed before our decision in Mapp v. Ohio.

 “I know of no authority in this court to say that in general state decisions shall make law only for the future. Judicial decisions have had retrospective operation for near a thousand years.” Kuhn v. Fairmont Coal Co., 215 U. S. 349, 372 (1910) (dissenting opinion of Holmes, J.).

 While Blackstone is always cited as the foremost exponent of the declaratory theory, a very similar view was stated by Sir Matthew Hale in his History of the Common Law which was published 13 years before the birth of Blackstone. Gray, Nature and Sources of the Law 206 (1st ed. 1909).

 It is interesting to note, however, that as early as 1801, Chief Justice Marshall in United States v. Schooner Peggy, 1 Cranch 103, had made clear that
“if subsequent to the judgment [in the trial court] and before the decision of the appellate court, a law intervenes and positively changes the rule which governs . . . the court must decide according to existing laws, and if it be necessary to set aside a judgment . . . which cannot be affirmed but in violation of law, the judgment must be set aside.” At 110.
Petitioner maintains that this case establishes a rule of absolute retro-activity and that the principle is the same with regard to constitutional rights. Respondent, on the other hand, maintains that the case stands for the proposition for which he contends, i. e., that a change in the law will be given effect while a case is on direct review, but cannot be necessarily invoked on collateral attack.

 “Because this was a criminal prosecution, it builds not only upon the cases which followed Schooner Peggy but also upon the principle, established at common law, that repeal of a penal statute prohibits prosecution of acts committed before the repeal if those acts had not yet been prosecuted to final judgment. The repeal is regarded as an indication that the state no lo'nger wants such acts punished, regardless of when they took place, and no longer views them as criminal.” Note, 71 Yale L. J. 907, 914 (1962).

 This was a diversity ease in which this Court held that the doctrine of Schooner Peggy, in effect, was incorporated in Erie R. Co. v. Tompkins, 304 U. S. 64. “A federal court sitting in a diversity case must therefore apply the most recent state court decision, even if it came after the operative events or the entry of judgment by a lower court.” Note, 71 Yale L. J. 907, 915 (1962). See, e. g., Blaauw v. Grand Trunk Western R. Co., 380 U. S. 127 (1965).

 Accord, Carpenter v. Wabash R. Co., 309 U. S. 23 (1940) (intervening statutory change); Vandenbark v. Owens-Illinois Glass Co., 311 U. S. 538 and cases cited at 541-542 (1941); Dinsmore v. Southern Express Co., 183 U. S. 115, 120 (1901) (intervening statutory change); Crazier v. Krupp, 224 U. S. 290, 308 (1912) (intervening statutory change).

 There was no mention of prospective overruling in the opinion, however three Justices voted to overrule Wilcox but reversed James’ conviction because “the element of willfulness could not be proven in a criminal prosecution for failing to include embezzled funds in gross income in the year of misappropriation so long as the statute contained the gloss placed upon it by Wilcox at the time the alleged crime was committed.” 366 U. S. 213, 221-222. Mr. Justice Black and Mr. Justice Douglas concurred in the reversal of the conviction on the basis that Wilcox was right and therefore failure to include *642 embezzled funds in taxable income was not a crime. However, Mr. Justice Black strongly disagreed with the prospective manner in which the overruling was done.
“[0]ne of the great inherent restraints upon this Court’s departure from the field of interpretation to enter that of lawmaking has been the fact that its judgments could not be limited to prospective application. This Court and in fact all departments of the Government have always heretofore realized that prospective lawmaking is the function of Congress rather than of the courts. We continue to think that this function should be exercised only by Congress under our constitutional system.” 366 U. S., at 225.
Compare the dissenting opinion of Mr. Justice Black in Mosser v. Barrow, 341 U. S. 267, 275 (1951), where he stated that a new rule of trustee liability should not be applied retroactively. For discussion of these cases see Currier, supra, m2; Note, 71 Yale L. J. 907.

 Eskridge v. Washington Prison Board, 357 U. S. 214 (1958), applied the rule of Griffin v. Illinois, 351 U. S. 12 (1956), requiring the State to furnish transcripts of the trial to indigents on appeal, to a 1935 conviction. The rule in Gideon v. Wainwright, 372 U. S. 335 (1963), that counsel must be appointed to represent an indigent charged with a felony, was actually applied retrospectively in that case since Gideon had collaterally attacked the prior judgment by post-conviction remedies. See also Doughty v. Maxwell, 376 U. S. 202 (1964). Jackson v. Denno, 378 U. S. 368 (1964), involving a *643 coerced confession, was also applied to the petitioner who was here on a collateral attack. See also McNerlin v. Denno, 378 U. S. 575 (1964). It is also contended that Reck v. Pate, 367 U. S. 433 (1961), supports the conclusion of absolute retroactivity in the constitutional area since the petitioner convicted in 1937 was released after a finding that the confession was coerced when judged by standards set forth in our cases decided subsequent to his conviction. See United States ex rel. Angelet v. Fay, 333 F. 2d 12, 24 (dissenting opinion of Marshall, J.).

 Great Northern R. Co. v. Sunburst Oil & Refining Co., 287 U. S. 358, 364 (1932) (referring to state court’s prospective overruling of prior decision).

 See Mapp v. Ohio, 367 U. S. 643, 661-662 (1961) (concurring opinion of Black, J.).

 There the Court detailed the lineup of the States on the exclusionary rule before and after Weeks pointing out that at the time of the decision 31 States rejected the rule and 16 States were in agreement with it.

 In an Appendix to the opinion, the lineup of States regarding the exclusion of illegally seized evidence was catalogued, indicating that there was some change since Wolf — 26 States excluded such evidence while 24 did not. At 224 — 225.

 See cases cited in n. 13, supra.

 Indeed, Mr. Justice Black in concurring said “that the federal exclusionary rule is not a command of the Fourth Amendment but is a judicially created rule of evidence which Congress might negate.” 338 U. S. 25, at 39-40.

 In Griffin v. Illinois, supra, the appeal which was denied because of lack of funds was “an integral part of the [State’s] trial system for finally adjudicating the guilt or innocence of a defendant.” At 18. Precluding an appeal because of inability to pay was analogized to denying the poor a fair trial. In' Gideon v. Wainwright, supra, we recognized a fundamental fact that a layman, no matter how intelligent, could not possibly further his claims of innocence and violation of previously declared rights adequately. Because of this the judgment lacked reliability. In Jackson v. Denno, supra, the holding went to the basis of fair hearing and trial because the procedural apparatus never assured the defendant a fair determination of vol-untariness. In addition, Mr. Justice White expressed grave doubts regarding the ability of the jury to disregard a confession found to be involuntary if the question of guilt was uncertain.