282 So.2d 392

**Wilton O'Neal TROTT**

v.

**STATE.**

**3 Div. 28.**

Court of Criminal Appeals of Alabama.

May 8, 1973.

Rehearing Denied May 29, 1973.

J. Paul Lowery, Montgomery, for appellant.

MacDonald Gallion, Atty. Gen., and Joseph G. L. Marston, III, Asst. Atty. Gen., for the State.

ALMON, Judge.

Wilton O'Neal Trott was convicted of murder in the first degree and sentenced to life imprisonment.

Mrs. Ila Hall, the deceased, operated a small grocery store in rural Autauga County. On the morning of December 28, 1965, neighbors noticed Mrs. Hall had not opened her grocery store at the usual time. They also observed lights on in the deceased's home. Upon investigation, the neighbors discovered the body of Mrs. Hall sprawled across her bed. Police were called and an investigation began. The State Toxicologist testified death resulted from a combination of wounds inflicted by a knife, gun shots, and bruises. He also testified a fingerprint of appellant was found in the house of deceased.

Testimony of several witnesses placed appellant in the vicinity of Mrs. Hall's home early in the evening on the day prior to which the body was discovered. One of these witnesses, W. M. Daniels, saw appellant's automobile parked on the side of the highway near deceased's home. Another witness, Claude Norris, testified appellant entered his service station on foot about 6:55 P.M. on the evening of December 27, bought some gasoline and left walking East. Later he reappeared in his automobile and returned the can in which the gas was put.

The only question presented by this appeal is whether the court erred in admitting into evidence over appellant's objection an alleged confession made by him to police officers after he had been arrested. We will set out the evidence on this point in some detail.

Deputy Sheriff Norris Champion testified that on the evening of December 29, 1965, he was called and notified that the State Trooper Carlton had arrested appellant for reckless driving and had taken him to the sheriff's office of Autauga County; that he arrived at the sheriff's office at 6:15 P.M. and observed appellant sitting inside; that he did not attempt to question appellant with respect to the homicide but confined his question to "how he was doing and where he had been;" that upon the arrival of Chief Deputy Sheriff Turner and State Investigators E. J. Dixon, John Jolley, and Bob Finley, appellant was photographed and fingerprinted; that at 8:00 P.M. he and Turner began to question appellant in an enclosed room; and that prior to any questioning appellant was told of certain constitutional rights he had by

Turner in the following series of statements:

"Q. All right, sir. Now, what was the first thing—well, who spoke to him first, Mr. Champion, when you closed the door?

"A. I believe Mr. Turner did. Mr. Turner told him what we were going to talk to him about, and advised him of his rights.

"Q. What'd he say?

"A. Sir?

"Q. What'd he tell him, Mr. Champion?

"A. He told him about—we wanted to question him on this murder we had, and advised him of his rights—

"Q. All right. Tell the Court—tell the Court—

"A. And that he didn't have to tell us anything.

"Q. Tell the Court what he told him about his rights, and everything you can remember.

"A. Well, he told him that he had the right to call a Lawyer, if he wanted to—

"Q. All right. What else did he tell him?

"A. And that he didn't have to give us a statement, and that he thought we had enough evidence, without a statement on it.

"Q. All right sir. What else did he tell him?

"A. And so Trott said, 'Well, he didn't know anything about it.' 'He didn't know a thing about it.'

.  .  .  .  .  .

"Q. All right, sir. Now, Mr. Champion, go back to where—when—to—when Turner told him all about his rights. Just tell us—just tell us all that he said that you remember.

"A. Well, I don't remember, word for word, but he advised him that he had a right to call a Lawyer—

"Q. All right, sir. And what else?

"A. If he wanted to, and that he didn't have to give a statement.

"Q. All right, sir.

"A. And he told him if the statement —that the statement that he give may be used against him, in evidence.

"Q. All right, sir. What else?

"A. Well, that's about all I remember. Mr. Lowery, that he told him there.

"Q. All right sir. Is that—in your best judgment, is that all that was said concerning his rights—in your best judgment?

"A. In my best judgment, it is. Yes, sir."

Champion testified that after being informed of his right to an attorney, the appellant said "he didn't want a lawyer."

Champion testified further that at this point Turner began to question appellant about the slaying of Mrs. Hall; that appellant told them, "He didn't know a thing about it;" that during the interrogation which lasted, according to Champion's testimony, approximately two and one half hours, Turner and he alternated questioning appellant; that the total time Champion questioned appellant prior to appellant's first statement was approximately one hour; and that shortly after questioning began at 8:00 P.M., appellant was fed two cheeseburgers.

Sometime around 10:30 P.M. appellant indicated he would talk to Champion if Turner would leave the room; that Turner did leave the room and appellant "told me all about what happened;" that after the oral statement Turner came back into the

room and wrote the statement out in long-hand on a yellow legal sheet; that at approximately 11:00 P.M. appellant was asked and did take off his clothing which was placed in a box and marked for identification; that shortly after 11:30 P.M. appellant took the officers to a point near Selma where Mrs. Hall's purse was recovered from a ditch by Champion; and that upon their return to the sheriff's office, Champion went home for the night.

On cross examination Champion testified that the appellant whom Champion had known four to five years appeared normal to him throughout the evening; that the appellant complained of being hungry and was fed; that while appellant indicated he had been taking "bennie pills" no mention was made by him of drinking beer; that no "pressure" was applied during the interrogation; and that the statement was not made under any threat, promise or hope of reward.

Chief Deputy Sheriff Robert Turner testified that he arrived at the sheriff's office at 6:30 P.M. the evening of December 29, 1965; that he observed appellant sitting in the lobby; that Turner inquired as to what appellant had been charged with and was told reckless driving; and that at 7:30 to 8:00 P.M. he made the following statements to appellant concerning his rights:

"Q. What did you say?

"A. I told him that he was under arrest for murder. That we had evidence implicating him in the murder of Mrs. Ila Hall, and that he didn't have to make a statement, and that if he wanted a lawyer, we'd get him one.

"Q. All right, sir.

"A. And anything he said might be used against him.

"Q. All right sir. Was there anything else? Did you tell him about his rights, or anything else?

"A. I asked him if he wanted to make a statement.

"Q. And what'd he say to that?

"A. And he said, 'I don't remember anything,' first, and then he said, 'I've been to Mobile, and just back—just got back to town,' and he first said he'd gone to Mobile after a load of whiskey, and then he remembered he threw something out on the highway, and as he gained his recollection, you might say, he told us just where he threw it out, and these were the articles we went and got.

"Q. All right, sir. Are these events you've—you're telling me about now, did they happen over a period of time, or right off—when you first started to questioning him?

"A. Yes, sir, they happened over a period of time—a few times, or a few minutes, I mean.

"Q. All right, sir. Now, then, you told us what you first said to him, and what he said. Now, then, what did—what questions did you ask him, in advising him of his rights?

"A. I asked him if he wanted to make a statement about Mrs. Hall.

"Q. All right, sir. And he said what?

"A. He said, 'No, he didn't want to make one right then.' "

Turner further testified that immediately after a dinner break, which lasted one hour, Jolley and Champion asked him a few questions; that about 9:00 P.M. questioning resumed and shortly after 9:00 P.M. appellant asked Turner to leave the room, whereupon appellant made an oral statement to Champion; that afterwards he returned to the room and wrote the statement in longhand; that sometime after 9:30 P.M., Turner went with the other officers to recover Mrs. Hall's purse and a gasoline can used by appellant; that upon their return to the sheriff's office, Turner and E. J. Dixon prepared a statement; and that prior to this second statement appel-

lant was informed in the following manner of his constitutional rights by Dixon:

"Q. Tell the Court, in substance, what rights, or what was said, by Dixon, to Trott, about his Constitutional rights, before he made that—made that statement.

"A. He was told that the statement —any statement he made could be used against him in court, and he was advised that he had a right to see a Lawyer, if he wanted one.

"Q. Uh hu.

"A. And he was not threatened, or abused, in any way, or promised any hope of reward.

"Q. All right, sir. Is there anything else, now, that was said to him, there?

"A. That's the best I can remember.

"Q. In your best judgment, is that all that was told him?

"A. That's all I can remember.

"Q. In your best recollection, and best judgment, is that all that he was advised—he was advised about his Constitutional rights?

"A. Yes, sir, I think so."

Turner testified that he was firm with appellant during the interrogation but did not curse him; that no threat or promise or hope of reward was made to appellant; and that he read this statement to appellant and appellant signed it in his presence.

State Investigator E. J. Dixon testified that he arrived at the Autauga County Sheriff's office at 7:00 P.M.; that at the conclusion of the photographing and fingerprinting of appellant, appellant was taken into a room occupied by him, Turner, Champion and Jolley; that Dixon asked appellant his name and for a physical description of himself; that after asking these questions he left and returned one hour later; that on this occasion Dixon asked appellant to remove his clothing,

which appellant did; and that other clothes were brought to appellant from his car.

Dixon further testified that the next conversation he had directly with appellant was about 1:15 A.M. upon their return from the trip to recover Mrs. Hall's purse; and that on this occasion, he informed appellant of certain constitutional rights, namely:

"Q. All right, sir. And before he— you started typing this statement, did you tell him anything?

"A. Yes, sir.

"Q. What'd you tell him?

"A. I told him that he didn't have to make a statement, and that any statement used—well, I asked him if he had been advised that he didn't have to make a statement; and that he could have a lawyer, if he wanted one—

"Q. All right, sir.

"A. And that a Lawyer would be provided, if he didn't have the money to pay for it and, of course, he said, then, that he had been advised of all of these things.

"Q. All right, sir. What else did you advise him? What else did you advise him, on that occasion—anything else?

"A. I don't remember it.

\*     \*     \*     \*     \*     \*

"Q. All right, sir. Now, Mr. Dixon, on that statement there concerning his— his knowledge of his right to a Lawyer, is there anything in there—do you recall anything that was said about his right to have a free Lawyer—one furnished to him by the State, if he couldn't afford one?

"A. He was told that he would be furnished a free Lawyer.

"Q. But that wasn't typed in the statement, though, was it?

"A. No, sir."

Immediately after the above statements were made, Dixon began to type the appellant's statement and the appellant initialed any corrections made by Dixon. This statement was read and signed by the appellant in the presence of both Dixon and Turner.

On cross examination Dixon testified that throughout the evening appellant appeared normal and rational and talked coherently.

John B. Jolley, State Investigator, testified that he arrived at the Autauga County Sheriff's office at approximately 7:00 P. M., December 29, 1965, and observed appellant sitting in a private room; that he did not question appellant at that time but waited until 7:45 P.M.; that when the first questioning session began, Jolley asked appellant what he had done with Mrs. Hall's pistol and pocketbook; that appellant replied to both questions, "I don't remember;" and that after he left the room Turner and Champion alternately questioned appellant beginning about 8:00 P.M.

The appellant testified that prior to the date of the hearing on the motion to suppress, he had never seen the statement he was alleged to have signed.

After appellant was stopped by the highway patrol for running a stop sign, he testified he was arrested for reckless driving and taken to the Autauga County Sheriff's office; that on the trip to the sheriff's office no questions were asked him except whether he had a pocket knife; that he replied that he did and turned it over to the officers; and that at the time of his arrest he was not advised of his right to an attorney either retained or appointed.

After arriving at the sheriff's office at 7:00 P.M., appellant was first questioned by Champion who said, "We know he done it," and that I "about as well as to go ahead and tell him all about it;" that at this point no one had advised him of his constitutional right to remain silent, have a

lawyer, etc.; that the interrogation by Champion lasted several hours and that Champion "kept telling me that I about as well go ahead and tell him. He knowed that I done it. It'd be better for me to get it off of my chest, and go ahead and tell him;" that Turner was also in the room that night and also indicated that he knew appellant "had done it;" and that in response to questions implicating him he replied, "I didn't know nothing about it."

The appellant further testified that Champion and Turner alternated questioning him; that Champion was "nice" to him while Turner was "rough" and cursed him; that after he ate supper Turner and Champion again began to alternate questioning him; that at no time during the evening was he informed of his constitutional rights; and that he requested an attorney prior to his interrogation but was denied one.

On cross examination the appellant repeatedly denied having been informed of his constitutional rights. His response to questions such as, "Did you—did you not say, 'if—if everybody will leave the room, I'd talk to Mr. Champion,'" or, "Mr. Trott, did you commit an act of violence of Mrs. Ila Hall?" was, "Not as I know of," or, "I can't be positive." At other times the appellant would deny a fact outright.

Appellant testified to the following facts relating to his physical and mental condition on the day of the interrogation: that he purchased approximately one hundred bennie pills at a truck stop located near Prattville on Highway 82; that after the purchase of these pills he went to Mobile and purchased fifty more; that he had taken all these pills prior to his arrest on December 29, 1965; that he had taken about twenty-five the day of his arrest, the last one being taken two hours prior to his arrest; that in addition to taking bennie pills he had been drinking beer all that day; that according to his best recollection he had drunk all but six from a case; that he informed Officers Champion and Turner that he had been on bennie pills and that

they "didn't have nothing to say about it;" that he had developed a severe headache that day in addition to being hungry; and that he also was sleepy.

The counsel for appellant brought out on redirect that appellant, who at the time of trial was twenty-four years old, had a ninth grade education and that his family had a history of mental disorders, his mother having been treated at Bryce Hospital for "bad nerves."

Testimony of Dr. C. B. Relfe, a licensed physician in the State of Alabama, revealed that he was familiar with the chemical ingredients of "bennie pills" and with their effect on a human being; that bennie pills are usually composed of amphetamine sulphate which is a stimulant; that the effect of these pills is to cause a feeling of exhilaration and sleeplessness; that the effect of a heavy dosage of these pills, e. g., twelve pills in a three to four hour period, would likely cause hallucinations, loss of equilibrium, amnesia; that the quantity which appellant said he had taken would likely but not invariably produce serious illness or death; and that a person under the strong influence of these pills would have less will to resist interrogation due to fatigue.

## I.

Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694, was decided on June 13, 1966. The interrogation and confession here in question occurred on December 29, 1965. Appellant's trial began on March 30, 1967. In Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L. Ed.2d 882, the United States Supreme Court held that the *Miranda* decision applied to *trials* (not interrogations) after the date *Miranda* was decided. If there was ever any doubt about the holding in Johnson v. New Jersey, supra, it was put to rest in Jenkins v. Delaware, 395 U.S. 213, 89 S.Ct. 1677, 23 L.Ed.2d 253, when

the Court rather speciously reasoned as follows:

"In Johnson, after considering the need to avoid unreasonably disrupting the administration of our criminal laws, we selected the commencement of trial as determinative. We of course could have applied *Miranda* to all judgments not final, although they were obtained in good-faith reliance upon constitutional standards then applicable. See Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965). As we pointed out, however, that choice 'would [have] impose[d] an unjustifiable burden on the administration of justice.' 384 U.S., at 733, 86 S.Ct., at 1781. On the other hand, we could have adopted the approach we took in *Stovall* [Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199] and *Desist* [Desist v. United States, 394 U.S. 244, 89 S.Ct. 1030, 22 L.Ed.2d 248] and made the point of initial reliance, the moment the defendant is interrogated, the operative event. See Schaefer, supra, at 646. But in an effort to extend the protection as was consistent with society's legitimate concern that convictions already validly obtained not be needlessly aborted, we selected the commencement of the trial. Implicit in this choice was the assumption that, with few exceptions, the commission and investigation of a crime would be sufficiently proximate to the commencement of the defendant's trial that no undue burden would be imposed upon prosecuting authorities by requiring them to find evidentiary substitutes for constitutional protections afforded by *Miranda*."

Thus, we have a situation in which law enforcement officers were required to give appellant the *Miranda* warning before the *Miranda* case was decided. If these officers had complied in every particular, they would have indeed been clairvoyant.

This problem was recognized in Nathan R. Sobel, The New Confession Standards,

Miranda v. Arizona, p. 112, when Mr. Justice Sobel stated:

"Since Johnson is to an extent 'practically' motivated, parenthetically it may be observed that the Supreme Court would have been of greater 'practical' assistance to all jurisdictions if it had made *Miranda* applicable to all *confessions obtained* after its date rather than to *trials commenced* after its date. Most large jurisdictions have 'backlogs' of confession cases where the police and prosecutors had understandingly failed to employ the protective device of the fourfold warnings."

▆ Regardless of our view, we must apply the holding in *Miranda* to this case. See Seagroves v. State, 282 Ala. 354, 211 So.2d 486.

## II.

We now turn to the question of whether this appellant was properly warned of his rights prior to interrogation. The substance of the holding in *Miranda* is as follows:

"To summarize, we hold that when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized. Procedural safeguards must be employed to protect the privilege and unless other fully effective means are adopted to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored, the following measures are required. He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights

must be afforded to him throughout the interrogation. After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him."

Also in *Miranda*, supra, it is stated:

"Accordingly we hold that an individual held for interrogation must be clearly informed that he has the right to consult with a lawyer and to have the lawyer with him during interrogation under the system for protecting the privilege we delineate today. As with the warnings of the right to remain silent and that anything stated can be used in evidence against him, this warning is an absolute prerequisite to interrogation. No amount of circumstantial evidence that the person may have been aware of this right will suffice to stand in its stead. Only through such a warning is there ascertainable assurance that the accused was aware of this right."

Also in *Miranda,* supra, the Court said:

"In order fully to apprise a person interrogated of the extent of his rights under this system then, it is necessary to warn him not only that he has the right to consult with an attorney, but also that if he is indigent a lawyer will be appointed to represent him. Without this additional warning, the admonition of the right to consult with counsel would often be understood as meaning only that he can consult with a lawyer if he has one or has the funds to obtain one. The warning of a right to counsel would be hollow if not couched in terms that would convey to the indigent—the person most often subjected to interrogation—the knowledge that he too has a right to have counsel present. As with the warnings of the right to remain silent and of

the general right to counsel, only by effective and express explanation to the indigent of this right can there be assurance that he was truly in a position to exercise it.

"Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked. If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent."

█ Measured by the above standard, we conclude that the appellant was not properly warned of his rights prior to any interrogation and consequently his alleged confession was erroneously admitted into evidence. Deputies Champion and Turner did not inform the appellant that he was entitled to an attorney before any questioning began. Neither did they advise him that if he could not afford to employ an attorney, one would be provided for him before any questions were asked. State Investigator Dixon mentioned that a "free lawyer" would be provided but he did not inform the appellant that this free lawyer would be provided prior to any questioning. Moreover, Dixon's warning came after the appellant had already orally confessed. Square v. State, 283 Ala. 548, 219 So.2d 377.

For erroneously admitting the appellant's alleged confession, the judgment appealed from is due to be reversed and the cause remanded for new trial.

Reversed and remanded.

CATES, P. J., and TYSON and HARRIS, JJ., concur.

DeCARLO, J., dissents.

DeCARLO, Judge (dissenting).

I cannot join in the reversal of this case. It is my opinion that appellant's confession was voluntary and in compliance with the standards outlined in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. Although the confession in this case occurred six months prior to *Miranda* supra, the testimony shows that admonishments from that decision were given. The precise wording of the procedural safeguards established in *Miranda* were not parroted, but other fully effective means were adopted as set forth below:

## I. THE RIGHT TO REMAIN SILENT

As shown by Deputy Champion's testimony in the majority opinion, accused was informed "that he didn't have to tell us anything," and "that he didn't have to give us a statement." These facts were later confirmed by Chief Turner. The stated warnings informed accused that he did not have to speak and conveyed to him the right to remain silent.

## II. ANYTHING HE SAYS CAN BE USED AGAINST HIM IN A COURT OF LAW

According to Champion, Chief Turner warned the appellant "that the statement

that he give may be used against him, in evidence." Also, Chief Turner testified that he told appellant, "anything he said might be used against him." From these remarks, appellant knew anything he said could and would be used against him in court.

### III. RIGHT TO THE PRESENCE OF AN ATTORNEY AND IF HE CANNOT AFFORD AN ATTORNEY ONE WILL BE APPOINTED FOR HIM PRIOR TO QUESTIONING, IF HE SO DESIRES

Again referring to the quoted testimony, Champion stated appellant was told "that he had the right to call a Lawyer, if he wanted to—," and Turner stated, "that if he wanted a lawyer we'd get him one." This advice conveyed to accused that even though he was without funds, he was entitled to the presence of an attorney.

The following excerpt from appellant's testimony bears out the fact that he was indeed aware of the privilege of having an attorney provided prior to questioning:

"Q. (by solicitor) They did not ask you if you wanted a lawyer?

"A. No, sir, they did not.

"Q. Mr. Trott, when did you decide you wanted a Lawyer?

"A. When did I want one?

"Q. Yes?

"A. Well, when—when they put the interrogating on me, I told them I wanted a Lawyer.

\*   \*   \*   \*   \*   \*

"Q. Who did you ask for a lawyer?

"A. I asked both of them.

"Q. Did you say—what did you tell them?

"A. I asked them how about getting me a Lawyer.

"Q. How about getting you a Lawyer?

"A. That's right.

"Q. Why?

"A. They're supposed to, ain't they?

In addition, it is also evident that all of the above testimony was corroborated by State Investigator Dixon. As shown, when inquiry was made regarding these specific rights, Trott responded "that he had been advised of all of these things."

The facts are that the accused was taken into custody on a reckless driving charge and brought to the Sheriff's office about 6:00 P.M. He was advised of his Constitutional rights prior to making his statement around 10:30 P.M. Deputy Champion testified that the period of interrogation lasted for an hour or an hour and a half. Nothing appears in the record to indicate the defendant was held incommunicado.

At the conclusion of Turner's explanation of the rights, appellant was asked if he wanted to make a statement, and he replied, "no, he didn't want to make one right then." Later, after appellant had been fed, he asked Turner to leave—that he wanted to talk to Norris (Champion).

After appellant made his statement, Dixon inquired about the clothing Trott was wearing and could he (Dixon) have them. Trott agreed, if they would get others from his car.

Subsequently, appellant rode to Selma with the officers and directed them to the place where he had thrown the victim's purse.

In conclusion, I believe that the above facts illustrate an attitude of voluntariness by the appellant.

While I do not contradict the right of an accused to be apprised of his Constitutional rights as per *Miranda*, I do contend that the exact wording from that opinion is not a prerequisite.

"The warnings required and the waiver necessary in accordance with our opinion today are, in the absence of *a fully ef-*

*fective equivalent*, prerequisites to the admissibility of any statement by a defendant." (emphasis added) *Miranda, supra.*

In the instant case, it is apparent from the record that *effective equivalents* were employed to inform appellant of those rights expressed in *Miranda.*

The interpretation of *Miranda* in this reversal seems to give the guilty not the same, but vastly more protection than the law-abiding citizen. Something is wrong with our system of justice when it permits a self-confessed killer to return to society with the sanctioned liberty to repeat his crime at will.

Over sixty years ago, Justice Holmes observed in Kepner v. U. S., 195 U.S. 100, 24 S.Ct. 797, 49 L.Ed. 114, and it is even more appropriate today:

".   .   .   there is more danger that criminals will escape justice than that they will be subjected to tyranny."