Dean L. OLSON and May L. Olson, Plaintiffs/Appellants,

v.

Pauline DILLERUD and all other persons unknown claiming any adverse estate or interest in or lien or encumbrance upon the property described in the Complaint, Defendants/Appellees.

Civ. No. 9056.

Supreme Court of North Dakota.

Feb. 13, 1975.

Rolfstad, Winkjer, Suess, McKennett & Kaiser, Williston, for plaintiffs and appellants.

Pringle & Herigstad, Minot, for defendants and appellees.

ERICKSTAD, Chief Justice.

This action was brought by the surface owners, Dean L. Olson and his wife, May L. Olson, to quiet title to the coal located upon or under 240 acres of land located in Burke County, North Dakota, and to establish right to any and all proceeds and profits from that coal including royalties deposited in escrow account No. 6871–07324–6 in the Union National Bank in Minot, North Dakota. The Burke County District Court ordered judgment in favor of the defendant, Pauline Dillerud, awarding to her all coal located upon or under the property in question together with all rights to the royalty funds derived from the mining of coal thereon.

This coal lies upon or under the Southeast Quarter (SE¼) and the South Half of the Northeast Quarter (S½NE¼) of Section Nine (9) in Township One Hundred Sixty-

two (162) North of Range Ninety-four (94) West of the Fifth Principal Meridian, to which Ole Dillerud received a patent from the United States on January 6, 1908.

Ole subsequently married the appellee, Pauline. On March 22, 1954, Ole and Pauline conveyed the above described property to Dean L. Olson by warranty deed. Contained in that deed was the following reservation and exception.

"(Excepting and reserving to the parties of the first part, their heirs and assigns, one hundred percent (100%) of all right and title in and to any and all oil, gas and other minerals in or under the foregoing described land with such easement for ingress, egress and use of surface as may be incidental or necessary to use such rights.)"

On December 6, 1956, Ole and Pauline leased the property to Baukol-Noonan, Inc., for coal mining purposes.

Ole died on October 21, 1968, leaving his wife Pauline and five children surviving him. All of the children subsequently quitclaimed their interest in the property to their mother Pauline.

On May 19, 1970, Dean and May Olson leased the same property to Baukol-Noonan, Inc., for coal mining purposes.

Baukol-Noonan commenced active mining operations on this property in 1972. Due to the nature of the circumstances leading to this appeal and the ensuing uncertainty as to the rightful recipient of the royalties, Baukol-Noonan deposited the royalties for the coal removed in escrow account No. 6871–07324–6 in the Union National Bank in Minot, North Dakota.

Concluding that this case did not differ materially from Christman v. Emineth, 212 N.W.2d 543 (N.D.1973), the district court held that Pauline was entitled to the coal.

Sections 47–10–21 and 47–10–22 of the North Dakota Century Code were held to be unconstitutional in *Christman*. The basic issue in this case is whether the holding in *Christman* should apply in this case. The statutes read:

"47–10–21. Reservation of coal limited to description.—All deeds and transfers of real property in this state that reserve to the grantor the coal in said property shall contain an accurate description of the coal reserved to the grantor, its nature, length, width, and thickness. The coal reserved to the grantor shall be limited to such description. The provisions hereof shall not apply to conveyances of state and school lands." N.D.C.C.

"47–10–22. Reservation without description ineffectual.—Every deed and transfer of real property in this state which recites a reservation to the grantor of the coal deposits in said property, but which does not contain an accurate description of such deposits as required in section 47–10–21, shall be construed to transfer to the grantee named in such deed, all right, title, and interest to such property and all deposits of coal imbedded therein, notwithstanding such attempted reservation." N.D.C.C.

In *Christman* the plaintiff, Christman, appealed from a judgment of the district court which held that the defendant, the Federal Land Bank of St. Paul, was the holder of fee simple title to fifty percent of all the oil, gas and other minerals including lignite coal in and under certain lands located in Oliver County, North Dakota, together with the right to enter upon the surface of the land to explore for and remove said minerals.

In *Christman,* pursuant to a contract for deed, the Federal Land Bank as grantor executed and delivered to Florian and Magdalena Emineth a limited warranty deed containing the following clause:

"Excepting and reserving to the party of the first part and its successors and assigns fifty percent of all right and title in and to any and all oil, gas and other minerals in or under the foregoing described land with such easement for in-

gress, egress and use of surface as may be incidental or necessary to use of such rights."

On January 7, 1954, Florian and Magdalena executed and delivered a warranty deed to the property to Conrad B. Miller and Lora B. Miller containing the following clause:

"Excepting therefrom and reserving to the grantors an undivided one-half interest in all oil, gas and other minerals of every kind, nature or description in, upon and under all of said lands and now owned by the grantors or either of them, and reserving to the grantors an easement for ingress to and egress from said lands and such use of the surface thereof as may be incidental or necessary to the use of such oil, gas and other mineral rights * * *"

In 1964 the Federal Land Bank filed a notice of claim to an undivided 50 percent interest in all minerals, in, on, or under the property.

The same property was conveyed by Conrad B. Miller to Carl T. Christman "subject to all reservations and exceptions of record."

This Court held that the words "all oil, gas and other minerals" were meant to include and did include lignite coal, that the excepting and reserving clause contained in the limited warranty deed which the Emineths received from the Federal Land Bank came within the purview of N.D.C.C. § 47–10–21 and N.D.C.C. § 47–10–22, and that the classification inherent in those sections was unreasonable, the discrimination resulting therefrom invidious, and the statutes therefore unconstitutional as being in violation of the equal protection clauses of Section 20 of the Constitution of North Dakota and Amendment XIV, Section 1 of the Constitution of the United States.

■ It is Dean's contention that *Christman* can be distinguished from this case and that it should not be expanded to apply to the parties herein.

He refers to several factors generally relating to the intent of the parties to support his contentions. Two statutes are relevant, N.D.C.C. § 47–09–11 provides that: "Grants shall be interpreted in like manner with contracts in general * * *." N.D.C.C. § 9–07–03 provides that: "A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting so far as the same is ascertainable and lawful * * *."

Dean suggests first that the two cases are distinguishable in that with Ole's death in 1968, the testimony of the parties became forever unavailable under N.D.C.C. § 31–01–03. That statute provides:

"31–01–03. Competency of party or officers of corporate party as to transactions or conversations with decedent— Exceptions.—In any civil action or proceeding by or against executors, administrators, heirs at law, or next of kin in which judgment may be rendered or ordered entered for or against them, neither party, except as provided in section 31–01–04 and section 31–01–05, shall be allowed to testify against the other as to any transaction whatever with or statement by the testator or intestate, unless called to testify thereto by the opposite party. Where a corporation is a party to any proceeding mentioned in this section, no agent, stockholder, officer, or manager of such corporation, shall be permitted to testify to any transaction or conversation had with the testator or intestate."

It is our view that notwithstanding that the so called "dead man's statute" is asserted to apply in this case and that it may not have been asserted to apply in *Christman,* that this is an insufficient basis for distinguishing the two cases. It is very likely that parol evidence could not have been received in any case because of the parol evidence rule which prevents varying the terms of a written document by parol. See Section 9–06–07, N.D.C.C.

Dean suggests, secondly, that this case can be distinguished from *Christman* in

that he purchased the land in question directly from the Dilleruds whereas Christman was not one of the original parties to the transaction involved in that case and could not, therefore, claim any reliance upon N.D.C.C. § 47–10–21 and N.D.C.C. § 47–10–22.

We think it is unimportant whether one is the first grantee or a subsequent grantee in a series of conveyances and accordingly, we find no merit in this contended distinction. If we were to recognize such a distinction as being meritorious, which we do not, it would be unavailing to Dean as the record does not disclose any convincing proof that Dean in fact relied upon the statutes referred to. It is interesting to note that Dean did not lease the coal until 13 and ½ years after Ole leased the coal and that at this time Ole had been dead 1 and ½ years.

Dean's third attempt to distinguish *Christman* is grounded upon the fact that the lease agreement entered into between him and his wife and Baukol-Noonan, on May 19, 1970, contained a specific reference to Section 47–10–21. Without discussing this contention in detail, we think it sufficient to say that it is a document so remote in time from the deed by which Dean secured his interest in the property that it cannot be considered significant as to his intentions at the time he acquired his interest in the property.

Dean further suggests that as the purchaser of farm land he would deem it reasonable and proper for the seller to reserve oil and gas which can be removed without disrupting farming operations, but that he would deem it unreasonable for the seller to reserve coal, the mining of which would destroy the surface and make it useless for farming purposes. From this he contends that we must assume that the parties entered into the purchase and sale of these premises with the understanding that the coal went with the surface rights.

The fact that agricultural land may be destroyed by mining was also an element in

*Christman* and therefore does not serve to distinguish the instant case from that decision.

The word "use" is employed as both verb and noun in the reservation construed in *Christman* and in the reservation in the present case. We held in *Christman* that the word "use" in 1943, when the Christman reservation was made, contemplated strip mining. We also noted that 1969 legislation, by requiring reclamation for productive use, including the planting of crops for harvest, regrading to original contour, or rolling topography or a different topography required for an intended higher use, and replacing two feet of topsoil "should result in restoration of surfaces temporarily disrupted by strip mining" and that the legislation "dealt with" the objections that strip mining destroyed the land and could not be found to be within the intention of the parties.

Recent events have raised doubts in the minds of some as to whether strip-mined lands have been, or can be, restored to productive use. If a case should come before us in the future, based on factual data in evidence, as to whether strip mining constitutes "use," as distinguished from destruction of, or permanent damage to, the surface, it may be necessary to reexamine the language of *Christman*, 212 N.W.2d 543 at 550–551 (N.D.1973). There is no basis in the record in the instant case for reexamining what we said in *Christman*.

Because of possible consequences of inadequate restoration of the surface following strip mining of coal, we urge the Legislature to take whatever steps may be reasonably necessary to insure that the surface is restored for agricultural and ranching purposes.

We do not write the contracts, deeds, or leases that come to us for our consideration, and we cannot rewrite them to suit our view of justice in each case when there is no evidence of fraud, duress or undue influence; but the Legislature can ease the hardship that may be presented by legisla-

tion enacted under the police power. We hope that in this day of advanced technology when men can be sent to the moon and returned safely, that means can be devised for restoring the topsoil and that legislation can be enacted to require that it be done if it is not now being satisfactorily restored.

Dean also urges that *Christman* differs from this case in that coal was known to exist in the area involved in *Christman* whereas it may not have been proven to exist in the area involved in this case. In *Christman* we said:

"Star Drilling, Inc. has stated at page 5 of its brief that 'At the time of the grant in question, coal was widely known to exist in this area * * *'. It is reasonable to assume that the parties to the deed in question knew of the existence of lignite coal in the area and that strip mining was the best method of removing said coal and intended that the instrument reserve to the grantor fifty percent of all the coal."

Dean argues that "[i]n the present case, the fact of the existence of coal may or may not have been known by the parties * *." What we are invited to do is speculate. A possible distinction based upon speculation is hardly worthy of consideration and cannot be a basis for not applying the principles expressed in *Christman* to this case.

Dean contends that another complicating factor in this case is that Sections 47–10–21 and 47–10–22 of the North Dakota Century Code were in existence at the time the Dilleruds conveyed the property to him in 1954. We see no merit in this contention as those statutes were also in existence at the time the conveyances in *Christman* were negotiated and there is nothing to indicate that the statutes should not have the same effect on the transactions in each case.

Finally, Dean questions certain aspects of the *Christman* decision, particulary relating to the equitable application of that decision to this case. Because the two cases are similar in all material respects, because the alleged differences are insignificant and thus do not serve to distinguish the cases, and because these matters have been adequately considered in *Christman*, we will not discuss them again here.

Having considered and rejected Dean's many arguments which were submitted in an attempt to distinguish this case from *Christman*, we conclude that it cannot be so distinguished.

This conclusion compels one final consideration—whether *Christman* should apply only to the parties involved in that action and to persons contracting after that case was decided or whether it should apply to this case.

The traditional rule is stated in 16 C.J.S. Constitutional Law § 101a at 469.

"Broadly, an unconstitutional statute is void, at all times and its invalidity must be recognized or acknowledged for all purposes, or as applied to any state of facts, and is no law, or not a law, or is a nullity, or of no force or effect, or wholly inoperative. Generally speaking, a decision by a competent tribunal that a statute is unconstitutional has the effect of rendering such statute null and void; the act, in legal contemplation, is as inoperative as though it had never been passed or as if the enactment had never been written, and it is regarded as invalid, or void, from the date of enactment, and not only from the date on which it is judicially declared unconstitutional."

Under this traditional view founded in the Blackstonian theory that it is the duty of the court not to "pronounce a new law, but to maintain and expound the old one," no issue of restricting the rule of an overruling case to prospective application would be entertained, since the very act of overruling was seen as a confession that the earlier rule had been erroneous and should not have been applied. *See* Note: Prospective Overruling and Retroactive Application in the Federal Courts, 16 Yale Law Journal 907 (1962). However, the general rule has undergone a gradual erosion culminating in 1932 with Great Northern Railway Compa-

ny v. Sunburst Oil & Refining Company, 287 U.S. 358, 53 S.Ct. 145, 77 L.Ed. 360 (1932), and Chicot County Drainage Dist. v. Baxter State Bank, 308 U.S. 371, 60 S.Ct. 317, 84 L.Ed. 329 (1940). Lemon v. Kurtzman, 348 F.Supp. 300 (E.D.Pa.1972).

■ "The accepted rule today is that in appropriate cases the Court may in the interest of justice make the rule prospective." Linkletter v. Walker, 381 U.S. 618, 628, 85 S.Ct. 1731, 1737, 14 L.Ed.2d 601 (1965); Lemon v. Kurtzman, 348 F.Supp. 300 (E.D.Penn.1972).

■ The rule applies even though we are evaluating the effect of a statute declared unconstitutional. The Supreme Court stated in *Linkletter, supra.*

"Petitioner contends that our method of resolving those prior cases demonstrates that an absolute rule of retroaction prevails in the area of constitutional adjudication. However, we believe that the Constitution neither prohibits nor requires retrospective effect. ·As Justice Cardozo said, 'We think the federal constitution has no voice upon the subject.'"

■ Consequently, we can properly apply the standards of retroactive application utilized in other areas of the law Lemon v. Kurtzman, *supra.*

The United States Supreme Court outlined the relevant considerations in Chevron Oil Company v. Huson, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971). The Court said:

"In our cases dealing with the nonretroactivity question, we have generally considered three separate factors. First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, see, e. g., Hanover Shoe, Inc. v. United Shoe Machinery Corp., *supra*, 392 U.S. 481, at 496, 88 S.Ct. 2224, at 2233, 20 L.Ed.2d 1231, or by deciding an issue of first impression whose resolution was not clearly foreshadowed, see, e. g., Allen v. ·State Board of Elections, *supra*, 393 U.S.

544, at 572, 89 S.Ct. 817, at 835, 22 L.Ed.2d 1. Second, it has been stressed that 'we must * * * weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation.' Linkletter v. Walker, *supra*, 381 U.S. 618, at 629, 85 S.Ct. 1731, at 1738, 14 L.Ed.2d 601. Finally, we have weighed the inequity imposed by retroactive application, for '[w]here a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the "injustice or hardship" by a holding of nonretroactivity.' Cipriano v. City of Houma, *supra*, 395 U.S. 701, at 706, 89 S.Ct. 1897, at 1900, 23 L.Ed.2d 647."

■■ We find no basis in *Chevron* for not giving *Christman* retroactive application.

We note with respect to the first consideration outlined in *Chevron* that *Christman* overruled no "clear past precedent on which litigants may have relied." Rather, *Christman* followed the decision in Adams County v. Smith, 74 N.D. 621, 23 N.W.2d 873 (1946), rendered several years prior to the time of the execution of the deed in the instant case. *Adams County* militates against the result urged by Dean in this case.

The second consideration is presented by the Supreme Court's suggestion that the establishing of a new principle of law by deciding an issue of first impression whose resolution was not clearly foreshadowed, weighs in favor of nonretroactive application. *Christman* was the first action in which the constitutionality of Sections 47–10–21 and 47–10–22 was directly in issue before this Court. There had, however, been some indication that those sections were viewed with disfavor prior to the time of the execution of the deed in the instant case. See Adams County v. Smith, 74 N.D. 621, 23 N.W.2d 873 (1946), Kershaw v. Burleigh County, 77 N.D. 932, 47 N.W.2d 132

(N.D.1951). Clearly, the mere fact that the constitutionality issue arose first in *Christman* does not preclude retroactive application nor will such vague foreshadowing compel it. Rather, these factors must be weighed with the other considerations bearing on the issue.

Finally Dean contends that economic hardships resulting from retroactive application would impose upon him great inequity. We are inclined to believe that Pauline's hardship would be more severe than Dean's contended inequity if we were not to apply *Christman* in this case. The Dilleruds sold their land when farm and ranch land was of little monetary value. Since then farm and ranch land has greatly increased in value. In the sunset years Pauline should not be deprived of the income that would otherwise be available to her from the mineral reservation. We note that in the amended lease the Olsons are to receive two cents per ton of coal mined from this land should they not be determined to be the owners of the minerals. From the income they will receive from the coal and from the income they will receive from the surface, they will derive substantial benefits. The Legislature may provide further for their protection by requiring that compensation be paid surface owners during the period they are deprived of the use of the land.

We conclude on the basis of these considerations that prospective application of Christman v. Emineth, 212 N.W.2d 543 (N.D.1973), is not warranted in this case.

The judgment of the district court is affirmed.

VOGEL, PEDERSON, PAULSON and SAND, JJ., concur.