Louis BALDRIDGE, Plaintiff,

v.

ARKANSAS BEST FREIGHT SYSTEM, INC., and Teamsters Local Union 957, Defendants.

No. C–3–81–239.

United States District Court, S.D. Ohio, W.D.

Nov. 8, 1982.

David L. Hall, Dayton, Ohio, for plaintiff.

Robert P. Bartlett, Bruce E. Pence, Dayton, Ohio, for defendants.

DECISION AND ENTRY SUSTAINING MOTION OF DEFENDANT LOCAL 957 SEEKING SUMMARY JUDGMENT ON GROUND THAT ACTION IS BARRED BY APPLICABLE STATUTE OF LIMITATIONS; JUDGMENT TO BE ENTERED FOR THE DEFENDANTS AND AGAINST THE PLAINTIFF; TERMINATION ENTRY

RICE, District Judge.

I. *Introduction*

Louis Baldridge is a former employee of Arkansas Best Freight System, Inc. ("ABF" or "Company"), in Dayton, Ohio. Teamsters Local No. 957 ("Local 957" or "Union"), affiliated with the International Brotherhood of Teamsters, Chauffeurs,

Warehousemen and Helpers of America (Teamsters), is the certified bargaining agent of employees at ABF. At all times relevant hereto, there was a collective bargaining agreement executed and in effect between the Company and the Union, known as the National Master Freight Agreement and certain riders, including the Central States Local Cartage Supplemental Agreement (collectively referred to herein either as "contract" or "collective bargaining agreement").

Baldridge commenced the instant action against ABF and Local 957 under Section 301(a) of the Labor-Management Relations Act, 29 U.S.C. § 185,[1] alleging that he was discriminatorily terminated from his employment at ABF, in violation of Sections 7 and 8(a)(3) of the Act. More specifically, in Count I of the Complaint, plaintiff alleges that, on or about April 25, 1977, the Company breached the collective bargaining agreement "by discriminating against . . . [him] by requiring that he be sent home . . ." (para. 1). In Count II, plaintiff further alleges that Local 957 breached its duty of fair representation on or about April 25, 1977, "by demanding [sic], acquiescing in [sic] and refusing to represent . . . [him] as a result of his termination of employment by the Company . . ." (para. 2). Plaintiff further alleges, in Count III of the Complaint, that the Company and the Union conspired against him, *inter alia*, by discriminatorily terminating his employment (para. 3(a)). Plaintiff seeks reinstatement with seniority as of February 23, 1976 (the date upon which he commenced his employment with ABF), and backpay as of April 25, 1977 (the date of his allegedly discriminatory discharge). Plaintiff also seeks reimbursement for various expenses to which he alleges he would have been entitled if his rights had not been violated, as well as attorneys fees, costs, and punitive damages in the amount of $250,000.

In their answers, defendants, ABF and Local 957, raise numerous defenses which need not be specifically recounted herein. Defendant, ABF, has also filed a counterclaim against plaintiff, alleging, *inter alia,* that his claims "are frivolous, unreasonable and totally without foundation" and that said action is "motivated by malice and vindictiveness on the part of the plaintiff . . ." (Doc. # 5, Counterclaim, para. 1); that plaintiff was unwilling to enter into a settlement agreement executed by both defendants and approved by the National Labor Relations Board in connection with complaints filed with the Board, containing the same allegations set forth in plaintiff's Complaint in this action and that his unwillingness was based upon argument which "the NLRB investigation revealed to be totally frivolous" (para. 10). ABF alleges that the present action constitutes an abuse of process (para. 15) and that plaintiff has caused it to sustain damages both to its business and to its reputation in the amount of $5,000. ABF also seeks $250,000 in punitive damages, in addition to attorneys fees and all costs of defense herein.

## II. *Facts*

The following uncontroverted facts have been gleaned from the materials submitted:

On February 23, 1976, plaintiff commenced work at ABF as a casual employee, whose job it was to load and unload trailers and to move freight from one trailer to another on the dock.[2] Exh. 4 at 6; Exh. 9

---

1. Section 301(a) of the Labor-Management Relations Act, 29 U.S.C. 185(a), provides:

   Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

2. Except where otherwise specifically indicated, defendants' materials will be referenced according to their Exhibit designation, *e.g.,* Exhibits # 1–8 are attached to ABF's Motion for Summary Judgment (Doc. # 12); Exhibit # 9 is attached to ABF's Reply Memorandum (Doc. # 18); and Exhibits A–C are attached to Local 957's Motion for Summary Judgment (Doc. # 14).

at 6. Plaintiff was hired for the position by ABF's Roger Zidaroff. *Id.* at 5. Between February 25, 1976 and April 25, 1977, plaintiff worked a total of between 50 and 60 days. Exh. 4 at 8.

During this 14 month period, plaintiff made five or six cash payments to the cashier at the Union Hall, Exh. 9 at 16, totalling between $90.00, *id.* at 11, and $95.00, Exh. 4 at 24, for which he received receipts. As of April 25, 1977, the last day of plaintiff's employ at ABF, he had made the above mentioned payments toward the Union initiation fee, but had not paid dues to the Union. Exh. 9 at 15–16. Plaintiff was not a member of Local 957. Exh. 4 at 25–27.

On April 25, 1977, plaintiff was working on the dock at ABF, when he was approached by the assistant shop steward, Mike Culley, who asked plaintiff why he had not been paying his Union dues. *Id.* at 8; Exh. 9 at 15. Plaintiff responded to this inquiry by asking Culley to show him in writing "that I have to pay union dues . . .," *id.* at 8, or "that I had to pay the initiation to continue working as a casual . . . ." Exh. 9 at 15. Without further comment, the assistant shop steward left and plaintiff returned to work. Exh. 4 at 8; Exh. 9 at 15.

Thereafter, plaintiff was approached by Frank Bocock, the shop steward, who asked him "what was this about having it in writing what I had just asked Mr. Culey [sic] and [plaintiff] informed [Bocock] that [he] would like to see it in writing that a casual has to pay before continuing to work, before paying dues." Exh. 9 at 16; *see also,* Exh. 4 at 9. Bocock said something to the effect that "it is just the way we do things . . . ." Exh. 9 at 17. Bocock did not show plaintiff anything in writing. *Id.* Rather, he left and plaintiff again returned to work. *Id.*

A short while later, plaintiff was called to the dock office, by a Mr. Southerland. *Id.; see also,* Exh. 4 at 9. Southerland, an ABF employee, was apparently "the head of the dock at that time, because Mr. Zidaroff was not there." *Id.,* Exh. 9 at 17. Southerland informed plaintiff that the company had a policy against nepotism and, since plaintiff's father-in-law was already an ABF employee, plaintiff was being terminated. *Id.* at 17–18; Exh. 4 at 11. Plaintiff was informed he was being dismissed because of the anti-nepotism policy and that he should punch out and go home. *Id.;* Exh. 9 at 18. Southerland did not broach the subject of plaintiff's paying Union fees during this exchange which took place while he and plaintiff were alone in the office. *Id.* at 21; Exh. 4 at 12.

After this exchange between Southerland and plaintiff, Frank Bocock appeared in the doorway of the office, but said nothing to plaintiff. *Id.* at 11; Exh. 9 at 18. Bocock and Southerland talked, but plaintiff did not overhear what was said. *Id.* at 20; Exh. 4 at 12. Neither Bocock nor Zidaroff said anything to him on April 25, 1977, about the reason for his termination. Exh. 9 at 20.

After plaintiff left work, he went home and talked to his father-in-law, Ralph Jones. *Id.* at 22; Exh. 4 at 12. Either the same day or the following day, Jones placed a phone call to the Union Hall, and eventually made contact with Glen Strange, Vice President of Local 957. *Id.* at 14–15; Exh. 9 at 14–15; Exh. 9 at 22–23.

The next day, April 26, 1977, plaintiff and Jones went to the Union Hall, where they met with Strange. *Id.* at 23; Exh. 4 at 15. During this meeting, plaintiff said very little; "Mr. Jones was doing most of the talking . . . I was just there." Exh. 9 at 23–24. Jones asked Strange "about the union representing [plaintiff] as a member." Exh. 4 at 16; *see also* Exh. 9 at 23. Strange replied that "they didn't have any records of me paying any initiation fee," *id.,* that "I had not paid into the union, paying dues," Exh. 4 at 16, and that "they couldn't represent me because I was not a member of the union." Exh. 9 at 23; *see also,* Exh. 4 at 16–17. Plaintiff did not indicate to Strange that he wanted a grievance form. *Id.* at 20.

Jones also asked Strange if the Union could do something about getting plaintiff paid for a whole day on April 25, even

though he had been sent home early. *Id.* at 17; Exh. 9 at 24. Strange agreed to, and did place a call to Roger Zidaroff, requesting that plaintiff be paid for the whole day. *Id.* at 18. During this phone conversation, which plaintiff and Jones were able to hear because it had been put on a "hands free telephone," *id.*, Zidaroff stated that on the day of plaintiff's dismissal, Zidaroff had received a phone call from the President of Local 957, Gary Legg, who told him to get plaintiff off the dock "or he would come up there and bodily throw [him] off." *Id.* at 25; Exh. 4 at 46.

At no time after the meeting between Strange, Jones and plaintiff at the Union Hall on April 26, 1977, did plaintiff, himself, have any further communication or contact with anyone from Local 957 or any ABF officials regarding his termination. *Id.* at 20, 32; Exh. 9 at 26, 50. Plaintiff did not discuss the matter with Willie Hodnett, then Terminal Manager of ABF in Dayton. *Id.* at 50. He did not approach any Union official to obtain a grievance form and did not, so far as the record indicates, ever complain in writing to any Company or Local 957 official about his termination on April 25th. *Id.* at 26, 49–50; Exh. 4 at 20.

In a correspondence addressed to Willie Hudnett [sic], General Manager of ABF in Dayton, dated May 13, 1977, plaintiff's counsel herein requested that plaintiff be given seniority status with commensurate benefits, effective as of June 1, 1976. This correspondence makes no reference to Plaintiff's termination on April 25th and has no relevance to any matter raised in the Complaint herein, *i.e.,* the termination of plaintiff's employment on April 25, 1977. Exh. 2–b. Thomas Harper, ABF's legal counsel, to whom the May 13 correspondence had been forwarded, responded thereto in a correspondence to plaintiff's counsel, dated May 25, 1977. Exh. 2–c. Therein, he apprised counsel that the collective bargaining agreement provided an adequate and exclusive procedure through which plaintiff could pursue his grievance; therefore, ABF would give no consideration to the request made in the correspondence of May 13. Exh. 2–c.

In August, 1977, plaintiff filed charges with the National Labor Relations Board, alleging unfair labor practices by both Company and the Union in connection with the events occurring on April 25, 1977. Exh. 4 at 27–32; Exh. 9 at 27–33. Subsequent to an investigation by the NLRB, the Union and ABF entered into a Settlement Agreement, under which plaintiff would have received a specific amount of back pay as well as reinstatement to his former position. *Id.* at 37; Exh. 4 at 32–39. The Regional Director of the NLRB approved the agreement. *Id.* at 39–40. Plaintiff, however, did not enter into the agreement. *Id.* at 39; Exh. 9 at 38. Plaintiff appealed the NLRB's action, *id.* at 41, which appeal was apparently denied. Plaintiff then commenced the instant action under 29 U.S.C. § 185(a) on April 16, 1981.

## III. *Motions for Summary Judgment by Defendants ABF and Local 957*

### A. *Overview of Defendants' Contentions*

Local 957 has raised six grounds in support of its motion for summary judgment (Doc. # 13). Briefly stated, these grounds are:

1. that plaintiff's claims, regarding violations of Sections 7 and 8(a)(3) of the Labor Management Relations Act, are pre-empted;

2. that plaintiff, as a casual, non-seniority employee at the time of his discharge, had no recourse to the contractual grievance procedure and thus, is attempting to enforce statutory, as opposed to contractual, rights in the present action;

3. that plaintiff's claims are barred under the applicable statute of limitations, Ohio Rev.Code § 2711.13, and/or laches;

4. that plaintiff's claims, which are essentially the same as those investigated by the National Labor Relations Board and which resulted in a settlement agreement, approved by the Board, are barred under the doctrine

of res judicata and/or collateral estoppel;

5. that the Court lacks subject matter jurisdiction, due to plaintiff's failure, without excuse, to exhaust or attempt to exhaust the internal union remedies contained in the Teamsters' Constitution and By-laws, regarding his claim that Local 957 breached its duty of fair representation; and

6. that the Court lacks subject matter jurisdiction, due to plaintiff's failure, without excuse, to exhaust or attempt to exhaust the administrative remedies contained in the collective bargaining agreement, regarding his claim of wrongful discharge.

ABF predicates its motion for summary judgment (Doc. # 12) on the last two grounds identified above, that is, plaintiff's failure to exhaust or attempt to exhaust either his internal union remedies or his contractual remedies.

In support of their respective motions, both ABF and Local 957 have submitted copies of the collective bargaining agreement and the Teamsters' Constitution. Additional exhibits annexed to ABF's motion include: the affidavits of two ABF officials at the time of plaintiff's discharge; authenticated copies of correspondence between plaintiff's counsel and certain ABF personnel in May, 1977; authenticated copies of the standard grievance forms used at the time in question; and a copy of plaintiff's deposition, taken by Local 957, on January 5, 1982. Additional exhibits annexed to the Union's motion include: the affidavit of its current Secretary-Treasurer and a copy of correspondence addressed to plaintiff by Local 957's legal counsel, dated September 15, 1977.

Plaintiff has submitted a memorandum contra defendants' motions for summary judgment (Doc. # 16), in which he, more or less, addresses each of the contentions collectively raised by defendants. Attached thereto is a correspondence addressed to

Mrs. Louis Baldridge, plaintiff's wife, from Weldon L. Mathis, Vice President of the Teamsters' International, dated August 1, 1977. This correspondence, which is not verified or authenticated, makes reference to "your complaint and request for assistance." Plaintiff's specific arguments in opposition to summary judgment will be set forth as they become pertinent in the forthcoming discussion.

ABF has also filed a reply to plaintiff's memorandum contra (Doc. # 18), to which is attached a copy of plaintiff's deposition, taken by ABF, on January 30, 1982. Relying primarily on excerpts from the deposition, ABF reiterates its contention that plaintiff failed to exhaust or attempt to exhaust either the grievance procedure contained in the collective bargaining agreement or the intra-union remedies contained in the Teamsters' Constitution. ABF also asserts that plaintiff has presented no evidence sufficient to overcome its motion for summary judgment, specifically noting that the correspondence addressed to Mrs. Baldridge has not been properly authenticated as required under Rule 56(c), Fed.R.Civ.P.

As will become readily apparent below, the Court has concluded that the present action is barred in view of plaintiff's failure to institute suit within the time period specified in Ohio Rev.Code Ann. § 2711.13. Because this ground is dispositive of, and fatal to the continued maintenance of this action, the Court will not discuss the remaining matters which have been presented in the motions for summary judgment filed by ABF and Local 957.

**B.** *Discussion*

**1.** *Statute of Limitations*

█ Local 957 seeks summary judgment on the ground that this § 301 action, filed nearly four years after plaintiff's discharge from ABF, is barred by the statute of limitations. The Union contends that the timeliness of the instant action is controlled by Ohio Rev.Code § 2711.13,[3] which establishes

---

3. Ohio Rev.Code § 2711.13 provides in pertinent part:

After an award in an arbitration proceeding is made, any party to the arbitration may file

a three month limitation on actions to vacate, modify, or correct arbitration awards. In support of its position, the Union relies on *United Parcel Service, Inc. v. Mitchell,* 451 U.S. 56, 101 S.Ct. 1559, 67 L.Ed.2d 732 (1981) (*Mitchell*), in which the Supreme Court determined the timeliness of an employee's § 301 action against his employer and his union by reference to the New York 90-day statute of limitations on actions to set aside arbitration awards.

The Labor Management Relations Act does not contain "a provision for any time limitations upon the bringing of an action under § 301." *International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW), AFL–CIO v. Hoosier Cardinal Corp.,* 383 U.S. 696, 698, 86 S.Ct. 1107, 1109, 16 L.Ed.2d 192 (1966) (*Hoosier Cardinal*). In *Hoosier Cardinal,* the first case in which the question of timeliness in § 301 actions was extensively considered by the Supreme Court, the Union "urged [the Court] to devise a uniform time limitation to close the statutory gap left by Congress." *Id.* at 701, 86 S.Ct. at 1111. Expressing the view that the "[l]ack of uniformity in the area is . . . unlikely to frustrate in any important way the achievement of any significant goal of labor policy," *id.* at 702, 86 S.Ct. at 1111, the Court declined to judicially legislate a uniform time limitations provision. Instead, the Court held "that the timeliness of a § 301 suit . . . is to be determined, as a matter of federal law, by reference to the appropriate state statute of limitations." *Id.* at 704–05, 86 S.Ct. at 1113 (footnote omitted).

Selection of the "appropriate state statute of limitations" in *Hoosier Cardinal,* a § 301 action commenced by the union on behalf of several former employees, involved a choice between a six-year provision governing oral contracts and a 20-year provision governing written contracts. The District Court, having characterized the ac-

tion as one "based partly upon the written collective bargaining agreement and partly upon the oral employment contract each employee had made . . . ," *id.* at 699, 86 S.Ct. at 1110, borrowed the six-year provision governing oral contracts and dismissed the Union's complaint which had been filed some seven years after the cause of action had accrued. *Id.* The Supreme Court described the action as "essentially an action for damages caused by an alleged breach of an employer's obligation embodied in a collective bargaining agreement." *Id.* at 705 n. 7, 86 S.Ct. at 1113 n. 7. However, because the action was predicated in part upon "the existence and duration of separate employment contracts between the employer and each of the aggrieved employees," *id.* at 706, 86 S.Ct. at 1114, the Court agreed with the District Court that "this § 301 suit may fairly be characterized as one not exclusively based upon a written contract." *Id.* Noting further that it found "no reason to inhibit the achievement of an identifiable goal of labor policy," *id.* at 707, 86 S.Ct. at 1114, *i.e.,* the "relatively rapid disposition of labor disputes," *id.,* the Supreme Court upheld the District Court's selection of the six year statute of limitations for purposes of determining the timeliness of the lawsuit.

In *Hoosier Cardinal,* the Supreme Court specifically reserved ruling on the question "[w]hether other § 301 suits different from the present one might call for the application of other rules on timeliness . . . ." *Id.* at 705 n. 7, 86 S.Ct. at 1113 n. 7. The Court had occasion to address this question in *Mitchell, supra,* 451 U.S. 56, 101 S.Ct. 1559, 67 L.Ed.2d 732. Unlike *Hoosier Cardinal,* which involved a claim only against the employer for breach of the collective bargaining agreement, *Mitchell* involved a claim against the employer for breach of the collective bargaining agreement *and* a claim against Union for breach of its duty of fair representation.

a motion in the court of common pleas for an order vacating, modifying, or correcting the award. . . .
Notice of a motion to vacate, modify, or correct an award must be served upon the ad-

verse party or his attorney within three months after the award is delivered to the parties in interest.

Having been discharged from his position for "dishonest acts," respondent Mitchell requested his Union to file a grievance on his behalf against the company. *Id.* at 58, 101 S.Ct. at 1561. The Union complied with his request and thereafter, pursuant to the terms of the collective bargaining agreement, the grievance came to be submitted to a panel comprised of an equal number of Company and Union representatives (Joint Panel). *Id.*

> The Joint Panel conducted a hearing, at which respondent was represented by the Union, and on February 16, 1977, it announced its decision that the discharge be upheld. App. 103–104. Under the collective-bargaining agreement, this decision was "binding on all parties." *Id.,* at 66, 101 S.Ct. at 1565; see, *id.,* at 103.

451 U.S. at 58, 101 S.Ct. at 1561.

Mitchell did not file his § 301 action against the Company and the Union until some seventeen months after the Joint Panel had rendered its contractually binding decision. "Ruling that the respondent's action was properly characterized as one to vacate the arbitration award entered against him," *id.* at 59, 101 S.Ct. at 1562, the District Court borrowed the New York 90-day statute of limitations governing actions to set aside arbitration awards and concluded that respondent's § 301 complaint was untimely filed. *Id.*

The Court of Appeals disagreed with the District Court's characterization of the lawsuit. In the Second Circuit's view, the action "was analogous to a breach of contract action because the issues were whether the collective-bargaining agreement had been breached and whether the union contributed to that breach by failure to discharge its duty of fair representation." *Id.* Based thereon, the Second Circuit held that the New York six-year provision governing contract actions should have been applied rather than the 90-day provision governing actions on arbitration awards. Conducting its own analysis of the action before it, the Supreme Court reversed.

At the outset of its opinion, the Supreme Court identified the task before it as that of determining "which limitations period is 'the most appropriate one provided by state law.'" *Id.* at 60, 101 S.Ct. at 1563, *quoting, Johnson v. Railway Express Agency,* 421 U.S. 454, 462 (1975). Relying on *Hoosier Cardinal, supra,* 383 U.S. at 706–07, 86 S.Ct. at 1113–14, the Court stated that "[t]his depends upon an examination of the nature of the federal claim and the federal policies involved." *Id.* at 60–61, 101 S.Ct. at 1563.

Examining the nature of Mitchell's claim, the Court observed that, "[a]lthough respondent did not style his suit as one to vacate the award of the Joint Panel, if he is successful the suit will have that direct effect." *Id.* In further support of the propriety of characterizing the action as one to set aside an arbitration award, thereby calling for an application of the state statute of limitations governing such actions, the Court stated:

> As *Hines [v. Anchor Motor Freight, Inc.,* 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976)]* makes clear, an employee may go behind a final and binding award under a collective-bargaining agreement and seek relief against his employer and his union only when he demonstrates that his union's breach of its duty "seriously undermine[d] the integrity of the arbitral process." 424 U.S., at 567, 96 S.Ct., at 1057.

451 U.S. at 61, 101 S.Ct. at 1563.

The Court acknowledged that "respondent's underlying claim against his employer is based on the collective-bargaining agreement, a contract." *Id.* at 62, 101 S.Ct. at 1563. However, the Court did not consider the nature of the underlying claim dispositive of the question of which state time limitation provision was the most appropriate. The Court explained:

> It is not enough ... for an employee such as respondent to prove that he was discharged in violation of the collective-bargaining agreement. "To prevail against either the company or the Union, petitioners must not only show that their discharge was contrary to the contract but must also carry the burden of demonstrating breach of duty by the Union ...." Thus, respondent's characteriza-

tion of his action against the employer as one for "breach of contract" ignores the significance of the fact that it was brought in the District Court pursuant to § 301 ... and that *the indispensable predicate for such an action is not a showing under traditional contract law* that the discharge was a breach of the collective-bargaining agreement, *but instead a demonstration that the Union breached its duty of fair representation.* *Id.* (citation omitted) (emphasis added).

Because the decision of the Joint Panel was "binding on all parties," the Court explained that "respondent was required in some way to show that the Union's duty to represent him fairly at the arbitration had been breached before he was entitled to reach the merits of his contract claim." *Id.* The Court, therefore, concluded that "[t]his ... makes the suit more analogous to an action to vacate an arbitration award than to a straight contract action." *Id.* (footnote omitted).

Considering the federal policies involved, the Court recalled its earlier statement in *Hoosier Cardinal, supra,* 383 U.S. at 707, 86 S.Ct. at 1114, "that one of the leading federal policies in this area is the 'relatively rapid disposition of labor disputes.'" *Id.* at 63, 101 S.Ct. at 1564. The Court further noted that this policy had been part of its reason for selecting the shorter state statute of limitations in *Hoosier Cardinal* and concluded that "similar analysis supports our adoption of the shorter period for actions to vacate an arbitration award in this case." *Id.*

Elaborating on its reasons for approving the shorter time limitations provision in the case before it, the Court stated:

Although the present case involves a fairly mundane and discrete wrongful-discharge complaint, the grievance and arbitration procedure often processes disputes involving interpretation of critical terms in the collective-bargaining agreement affecting the entire relationship between company and union. ... This system with its heavy emphasis on grievance, arbitration and the "law of the shop,"

could easily become unworkable if a decision which has given "meaning and content" to the terms of an agreement, and even affected subsequent modification of the agreement, could suddenly be called into question as much as six years later. *Id.* at 63–64, 101 S.Ct. at 1564 (citation omitted).

Although the specific choice of state statutes of limitations in *Hoosier Cardinal* was not considered to be binding, *see, id.,* at 63 n. 5, 101 S.Ct. at 1564 n. 5, the Court noted that "if New York adopted a specific 6-year statute of limitations for employee challenges to awards of a Joint Panel or similar body, we would be bound to apply that statute under the reasoning in *Hoosier Cardinal.*" *Id.* at 64, 101 S.Ct. 1564. However, "[g]iven the choices present here and the undesirability of the results of the grievance and arbitral process being suspended in limbo for long periods," *id.,* the Court reinstated the District Court's dismissal of the action based upon its selection of the 90-day statute of limitations on actions to set aside arbitration awards.

Local 957 contends that the Supreme Court's reasoning in *Mitchell* and its resulting adoption of the state statute of limitations governing arbitration awards controls the timeliness question in this § 301 action and requires application of Ohio's three month provision. Ohio Rev.Code Ann. § 2711.13 (Page 1971). Plaintiff, for his part, does not suggest another specific state provision as being more appropriate, but does flatly disagree with the Union's position. Plaintiff argues that the Union's refusal to represent him, together with the terms of the collective bargaining agreement limiting access to the arbitration procedure to employer or union representatives, kept him from being able to invoke or pursue the grievance machinery. Plaintiff argues that, since he was denied access to the arbitration process due to the misconduct of Local 957, it would be inappropriate to determine the timeliness of this lawsuit by reference to the state statute of limitations which, by its own terms, operates only after there has been an arbitration award.

Considered in isolation or under a narrow reading of *Mitchell,* plaintiff's contention that a statute of limitations governing actions to set aside arbitration awards is not the "most appropriate one" for determining the timeliness of a § 301 action in which there has been no arbitration, has surface appeal. However, in resolving the question whether, and to what extent, *Mitchell* controls the timeliness question in a § 301 action where, in contrast to Mitchell, the employee's dispute was not submitted to arbitration or to an analogous proceeding, this Court does not write on a blank slate. The Sixth Circuit recently considered this question in *Badon v. General Motors Corp.,* 679 F.2d 93 (6th Cir.1982) (*Badon*). Thus, it is to the Sixth Circuit's recent interpretation of *Mitchell* that this Court must look for guidance.

*Badon,* like *Mitchell* and like the present § 301 action, involved a claim against the employer for breach of the collective bargaining agreement and against the union for breach of its statutory duty of fair representation. *See,* 679 F.2d at 95, 97 & n. 4. After suffering "an on-the-job-injury" in December, 1970, Badon apparently filed two claims with the company; one for worker's compensation and one for a total and permanent disability pension. *Id.* at 95. On October 26, 1982, while the pension claim was still pending, Badon settled his worker's compensation claim, agreeing, *inter alia,* to quit his job voluntarily.

Thereafter, on December 3, 1971, Badon was notified that his pension claim was being denied on the ground that there was insufficient medical evidence to support the claim. *Id.* Badon's Union had thirty days to appeal the company's denial. However, "[n]o appeal was taken and General Motor's decision became final and binding on all parties pursuant to the terms of the national contract." *Id.*[4]

In October, 1977, nearly six years after the company's decision became final and binding under the terms of the contract, Badon filed his § 301 action against the company for wrongful denial of his pension claim and against the Union for "failing to represent him fairly in the processing of his pension claim. . . ." *Id.* Applying the Michigan three year statute of limitations for tort actions, the District Court granted defendants' motions for summary judgment.

Considering the timeliness question under pre-*Mitchell* authority, the Sixth Circuit found no error in the District Court's selection of the state three year tort provision. The Court recalled the principle first announced in *Hoosier Cardinal, supra,* 383 U.S. at 704–05, 86 S.Ct. at 1112–13, that the timeliness of a § 301 action is to be determined by reference to the "most analogous state statute. . . ." 679 F.2d at 95. The Court then noted that it had "consistently held that the Michigan tort statute governs the timeliness of section 301 actions." *Id. See, e.g., Echols v. Chrysler Corporation,* 613 F.2d 722 (6th Cir.1980); *Smart v. Ellis Trucking Co.,* 580 F.2d 215 (6th Cir.), *cert. denied,* 440 U.S. 958, 99 S.Ct. 1497, 59 L.Ed.2d 770 (1978). The Court found no merit to Badon's attempt to distinguish his case from the earlier authority on the ground that his claim involved wrongful denial of pension benefits rather than wrongful discharge. *See, id.* at 95–96.

The Court briefly addressed Badon's fraud claim, approved the lower court's ruling with respect thereto, *id.* at 96, and then turned "to the more difficult statute of limitations question," raised by *Mitchell,* which had been decided "[a]fter the initial briefs were filed but prior to oral argument and the filing of appellant's reply brief. . . ." *Id.* As foundation for further discussion, the Sixth Circuit highlighted certain aspects of the Supreme Court's analysis of the § 301 action in Mitchell, including, *inter alia,* that:

> Even though the plaintiff-employee's claim against the employer—wrongful discharge, denial of pension benefits, etc.

---

**4.** The Court explained that "[o]rdinarily, the employee could then file a renewed application but because Badon had resigned his position in the settlement of his worker's compensation claim . . . all his internal remedies against the company were lost." 679 F.2d at 95.

—arises out of the employment contract, the merits of that claim will not be heard unless the employee successfully challenges the finality accorded the employer's decision. *That finality stems from the fact that the decision against the employee will have been reached pursuant to a contractually established union-management dispute resolution process, the results of which are binding on all parties* to the contract, including the employee. Circumventing that finality requires an attack on the fairness of the decision-making process. . . . This is the substance of an unfair representation claim against a union. . . . Because the effect of a decision for the employee in *Mitchell* would have been the vacating of an arbitration award won by the employer *pursuant to the terms of the employment contract,* the Court felt that the state statute governing such actions provided the most appropriate time limitations under *Hoosier Cardinal.*

*Id.* at 97 (emphasis added) (citation and footnote omitted).

The Sixth Circuit then identified the precise question before it, namely, "whether *Mitchell* controls here, or whether, as Badon suggests, it is inapposite because, unlike the employee's claim in *Mitchell,* Badon's pension dispute was never submitted to arbitration or heard by any impartial panel." *Id.* Initially, the Court remarked that "[p]erhaps the most vital part of the analysis in *Mitchell* was the Court's recognition that section 301 claims are neither standard contract nor standard tort actions." *Id.* The Sixth Circuit then moved to a discussion of what a § 301 action is, as opposed to what it is not:

The purpose of an employee's section 301 lawsuit . . . . is to set aside a *final and binding decision* reached *pursuant to the terms of a collectively bargained agreement* . . . . [T]he focus in the first instance challenges the process by which a labor dispute was privately *settled. . . Efficiency is a fundamental concern.* The parties bargain for and devise a private system of adjudication, in part to avoid the expense and delay of the public

system. Yet *the public system . . . remains close at hand in order to protect the employee's right to be heard by a process that is fundamentally fair. This is our primary concern.* The substance of the section 301 claim will be heard in federal court only if the *internal dispute resolution process has broken down.* Otherwise the interest of the employer and union in *an efficient grievance resolution system* are paramount.

*Id.* (emphasis added).

Again looking specifically at *Mitchell,* the Sixth Circuit made two additional observations. First, it commented that, in *Mitchell,* the Supreme Court had "repeatedly stressed the importance of protecting the *integrity of internally resolved disputes* by according them absolute finality through the imposition of relatively short state statutes of limitations." *Id.* at 98 (emphasis added) (citations omitted). Second, the Sixth Circuit stated that "[t]he New York arbitration statute was appropriate not only because the effect of a decision for the employer [sic] would have been to vacate an arbitration awards, but also because *arbitration, like a grievance resolution system, is a private method of resolving disputes."* *Id.* (emphasis added).

Assessing the § 301 action before it, the Sixth Circuit did not find the fact that Badon's complaint had not been submitted to arbitration of sufficient import to distinguish "the underlying rationale of *Mitchell." Id.* The Court explained:

Where the parties have contracted to settle claims among themselves, their final decisions should not be exposed to collateral attack for long periods . . . . Otherwise, the *internal system* will be just another step in a lengthy process of litigation rather than an *efficient and unitary method of disposing of the high volume of grievances generated under any large scale employment contract.*

*Id.* (emphasis added) (citation omitted).

Based upon its analysis of *Mitchell* and the nature of § 301 actions, the Sixth Circuit held:

Where an employer's decision has become *final through the operation of the collectively bargained-for private system of dispute resolution,* the rule of *Mitchell* applies and the state statute of limitations pertaining to the vacation of arbitration awards will be utilized in subsequent federal court proceedings.

*Id.* (emphasis added). The Court deemed the rule of *Mitchell* applicable to Badon's § 301 action, reasoning that "[a]lthough [the] claim was never heard by an impartial panel *because of the union's failure to appeal it, the dispute was resolved and became final according to the contractually established resolution process." Id.* (emphasis added).

Under *Badon,* there is no merit to plaintiff's opposition to having the timeliness of this § 301 action determined by reference to § 2711.13. Implicitly urged to do so, the Sixth Circuit in *Badon* rejected a narrow reading of *Mitchell,* that is, one which would limit its applicability, and, thus, the selection of the state statute of limitations governing actions to set aside arbitration awards to only those § 301 actions wherein the employer's dispute had actually been submitted to arbitration or to an analogous proceeding. In other words, in *Badon,* the Sixth Circuit considered and rejected an argument similar to the one advanced by plaintiff herein, that a state statute of limitations which, by its own terms, operates only after there has been an arbitration award, is not the most appropriate one by which to determine the timeliness of a § 301 action in which there has been no arbitration.

In the present case, as in *Badon,* the plaintiff's dispute was not submitted to arbitration, but did become final by virtue of the failure of any party to take actions mandated by the collective bargaining agreement. Specifically, Article 7 of the contract provides with respect to the grievance machinery, that:

> Provisions relating to Local, State and Area Grievance Machinery are set forth in the applicable Supplements to this Agreement.
>
> . . . .
>
> The procedure set forth in the Local, State and Area grievance machinery and in the national grievance procedure may be invoked only by the authorized Union representative or the Employer.

Ex. A at 26–27.[5]

Article 46, which is contained in the Supplemental Agreement, specifies the following procedures when an employee is discharged:

> The Employer shall not discharge nor suspend any employee without just cause, but in respect to discharge or suspension shall give at least one warning notice of the complaint against such employee, in writing. . . .
>
> Discharge must be by proper written notice to the employee and the Union affected. Any employee may request an investigation as to his discharge or suspension. . . . *Appeal from discharge, suspension or warning notice must be taken within ten (10) days by written notice,* and a decision reached within thirty (30)

5. It should be noted that for purposes of applying *Badon,* Plaintiff's status as a union or nonunion member is irrelevant, because the collective bargaining agreement does not restrict the availability of the grievance process solely to union members. As was noted in the main text, the grievance procedures are contained in the Supplement to the National Master Freight Agreement. Article 40 indicates specifically that persons such as Plaintiff are included within the scope of the agreement, by stating that "employee also includes, but is not limited to, *all employees used in dock-work,* checking, stocking, loading, unloading, handling, shipping, receiving, assembling and allied work." Ex. A at 94 (emphasis added). In addition,

Article 46 provides that "*[a]ny employee* may request an investigation as to his discharge or suspension." *Id.* at 109 (emphasis added). While the higher stages of the grievance procedure may be invoked only by the union or employer, there is no indication that the grievance process is restricted to union members only. *See, id.* at 106–08. Moreover, in the context of the present case, even if resort to the higher stages of the grievance procedure had been available only to union members, the provisions under which the employer's decision involved herein became final, i.e., those contained in Article 46, applied to *any* employee, including, obviously, Plaintiff.

days from the date of discharge, suspension or warning notice.... If no decision has been rendered on the appeal within thirty (30) days, the case shall then be taken up as provided for in Article 45, Section 1 of this Agreement.

*Id.* at 109–110. Article 45, Section 1 indicates that "[d]isputes shall first be taken up between the Employer and the Local Union involved." *Id.* at 105. Failing an adjustment by these parties, Article 45 specifies further processing of the grievance, including, *inter alia,* reference to the Joint Local Area and State Cartage Committees. *Id.*

The bargaining agreement does not indicate whether the initial written appeal from discharge which is required by Article 46 must be made by the union, or by the affected employee, although the agreement does indicate, as was previously noted, that the higher stages of the grievance process may only be invoked by the union representative or by the employer. This fact, however, is irrelevant. *Regardless* of which party, *i.e.,* Baldridge or the Union, was responsible for initiating the appeal, the mandatory language of Article 46 indicates that when *no written appeal* of the April 25, 1977 discharge was made by *any* party within ten days, the matter *was* resolved pursuant to the operation of the collective bargaining agreement, *i.e.,* all plaintiff's internal remedies against ABF were "foreclosed." *Badon,* 679 F.2d at 95. The use of the phrase "[a]ppeal ... must be taken within ten (10) days by written notice," *id.* at Ex. A, p. 110, permits no other conclusion.

Plaintiff has contended that § 2711.13 is not properly applicable herein because he was denied access to the grievance machinery. *See,* doc. # 16, p. 4. Unfortunately, this type of claim, or a similar disregard of union obligation, is necessarily involved in every action predicated on a breach of the duty of fair representation, and did not prevent the Sixth Circuit in *Badon* from concluding that the limitations period involved therein should be calculated by reference to state arbitration statutes, if any existed which might be appropriately applied. In *Badon,* the company determined that there was insufficient evidence to support Badon's application for a pension, and the union failed to file an appeal within thirty days, thereby permitting the employer's decision to become final under the contract. *See,* 679 F.2d at 95. Badon's subsequent action in district court was premised in part upon the union's failure "to represent him fairly in the processing of his pension claim against the company." *Id.* Despite the fact that Badon, like the plaintiff herein, was denied access to the grievance machinery by the union, the Court found no barrier to utilizing the "state statute of limitations pertaining to the vacation of arbitration awards." *Id.* at 98.

Given the fact that there does not appear to be any basis upon which *Badon* may be distinguished from the present case, this Court is obliged under that decision, to apply *Mitchell* and to select as the appropriate limitations period the pertinent Ohio statute relating to the vacation of arbitration awards. That statute, of course, is § 2711.13, and it is apparent that plaintiff's action, which was not filed until almost four years after his discharge, was not initiated within the time period prescribed in that section.

## 2. Retroactive Application of Mitchell

Although Plaintiff has not raised the issue of whether *Mitchell* and *Badon* should be applied retroactively to this case, the Court will briefly address that matter. In *Chevron Oil Co. v. Huson,* 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971) (*Chevron Oil*), the Supreme Court outlined the following factors for consideration in determining whether a decision should be given retrospective effect:

First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, ... or by deciding an issue of first impression whose resolution was not clearly foreshadowed.... Second, it has been stressed that "we must ... weigh the merits and demerits in each case by looking to the prior history of the rule in

question, its purpose and effect, and whether retrospective operation will further or retard its operation." *Linkletter v. Walker, supra,* 381 U.S. 618, at 629, 85 S.Ct. 1731, 14 L.Ed.2d 601. Finally, we have weighed the inequity imposed by retroactive application.

*Id.* at 106–07 (citations omitted). In *Hudson v. Teamsters Local Union No. 957,* 536 F.Supp. 1138 (S.D. Ohio 1982) (*Hudson*), this Court applied the *Chevron Oil* criteria and determined that *Mitchell* should operate retroactively. *See, id.* at 1143–1145. After the decision in *Hudson,* this Court again applied *Mitchell* retroactively in *Lamore v. Local 87, United Rubber Workers,* 550 F.Supp. 1005, 1012–1016 (S.D. Ohio 1982) (*Lamore*).[6] Therein, it was determined that although the first prong of the *Chevron Oil* test had been satisfied, the two remaining requirements for non-retroactivity had not been demonstrated. Specifically, this Court concluded that retrospective application of the decisions in *Mitchell* and *Badon* would not only " 'achieve the precise effect that was intended by the Supreme Court,' " *id.* at 1014, quoting from *Kikos v. International Brotherhood of Teamsters,* 526 F.Supp. 110, 115 (E.D.Mich.1981), but would also not be inequitable in view of the Supreme Court's obvious intention that *Mitchell* should be applied retroactively in most circumstances. *See, id.* at 1014–1016. Based on the analysis contained in *Lamore,* it is apparent that *Mitchell* and *Badon* should be applied retroactively in the present action as well, and that, accordingly, Plaintiff Baldridge's action, which was not filed until almost four years after his discharge on April 25, 1977, is barred under the statute of limitations contained in Ohio Rev.Code Ann. § 2711.13. Consequently, the present action must be, and hereby is dismissed based on plaintiff's failure to institute suit within the limitations period contained in § 2711.13.

### IV. *Conclusion*

Based on the preceding analysis, the Court finds that the present action against Defendants ABF and Local 957 must be dismissed in its entirety by virtue of the application of the statute of limitations period set forth in Ohio Rev.Code Ann. § 2711.13. Branch 3 of Local 957's motion for summary judgment is thus sustained. The remainder of the grounds set forth in Local 957's motion and those grounds set forth in ABF's motion for summary judgment are *not* ruled upon.

The Clerk is to enter judgment for the Defendants.

The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.

---

**6.** In *Lamore,* this Court also considered a Sixth Circuit decision which was rendered subsequent to *Badon* and which appears to conflict with *Badon. See, id.* at 1010–1012, discussing *Newton v. Local 801 Frigidaire Local of the International Union of Electrical Workers,* 684 F.2d 401 (6th Cir.1982). Reference may be had to this Court's opinion in *Lamore* for that discussion; it is merely relevant at this point to note that despite any apparent conflict, this Court is obliged to follow the earlier panel decision in *Badon.*